Timothy W. Miller, Bar No. 5-2704
Senior Assistant Attorney General
Prentice B. Olive, Bar No. 8-6691
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-5820
(307) 777-3608
(307) 777-8920 Facsimile
tim.miller@wyo.gov
prentice.olive@wyo.gov

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| BLENDI CUMANI, M.D., and | ) | |
| ROLAND SHEHU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-CV-55-ABJ |
| | ) | |
| CHRIS QUEEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Chris Queen, in his individual capacity, submits the following memorandum in support of his motion for summary judgment.

## I.  PRELIMINARY STATEMENT

This is a baseless false arrest/detention and malicious prosecution case brought pursuant to 42 U.S.C. § 1983.  (ECF No. 2).  The plaintiffs are Blendi Cumani, M.D. and Roland Shehu, residents of North Dakota and Pennsylvania, respectively.  (*Id.* at ¶ 1).  The defendant is Chris Queen, a longtime Senior Game Warden in Park County (now retired).  (*Id.* at ¶ 3; Queen Aff.,

App. Ex. A at ¶¶ 1-5).[1]   Queen is entitled to qualified immunity on both of plaintiffs' claims and, therefore, summary judgment should be granted.

The case arises from a hunting trip plaintiffs took in October, 2019.  (Viles Dep., App. Ex. U at 38:2-16).  Plaintiffs' guide was Tyler Viles, who worked for Richmond Ranch Outfitting.  (*Id.* at 9:2-11).  Another hunter, George Schnell, was also in the Viles group.  (*Id.* at 38:2-16).  On October 27, 2019, Viles took the group hunting on Heart Mountain in Park County.  (*Id.*).  The group collectively had four cow/calf elk licenses.  (App. Ex. A at ¶ 32).

Cumani shot and killed two cow elk and Schnell shot and killed a bull elk.  (App. Ex. A at ¶ 23).  Since Schnell only had a cow tag, he was guilty of a wrong-sex hunting violation.  (*Id.*).  The owner of the outfitting company (Brett Richmond) called and reported the violation to Queen.  (Queen Trial Test., App. Ex. O at 200:5-11, 200:18-25).  Shortly thereafter, a neighboring property manager (Brian Peters) called Queen and reported that he had heard a group of shots in the area and observed two wounded elk, one of which was a bull.  (App. Ex. A at ¶¶ 19-20).  If the Viles group shot the two wounded elk on top of the three they had killed, that would place them over-limit by one elk and also constitute another wrong-sex violation.  (App. Ex. A at ¶¶ 32-33).

As detailed below, Queen developed substantial information over the next two hours indicating that the Viles group had committed an over-limit and additional wrong-sex violation.  (App. Ex. A at ¶¶ 20, 26-35).  Plaintiffs and Schnell planned to leave Wyoming that day (on October 27, 2019).  At that point, plaintiffs allege Queen ordered them to go to Richmond's house and stay there.  (Cumani Dep., App. Ex. W at 46:1-10; Shehu Dep., App. Ex. Y at 57:1-6, 57:15-22).  Plaintiffs did so.  (App. Ex. W at 55:6-14; App. Ex. Y at 78:17-25).  Queen performed additional investigation over the next few hours, during which he located wounded elk (among

---

[1] Citations to "App." are to the appendix submitted herewith.

other things), and ultimately arrived at Richmond's house.  (App. Ex. A at ¶¶ 39-47).  Plaintiffs subsequently left Richmond's house (and traveled home).  (App. Ex. W at 56:13-17).

Based on the foregoing, plaintiffs allege a claim for false arrest and detention.  (ECF No. 2 at ¶ 32).  However, the claim fails as a matter of law.  To begin with, Queen has qualified immunity against a claim that his interactions with plaintiffs constituted an arrest.  Further, Queen had arguable probable cause for an alleged arrest anyway.  Finally, Queen had arguable reasonable suspicion for an alleged investigative detention.  Consequently, Queen is entitled to qualified immunity on plaintiffs' false arrest and detention claim.

Plaintiffs' malicious prosecution claim fails as well.  On and after October 28, 2019, Queen performed an extensive investigation, during which, among other things, he located two dead elk that would have been in range of the Viles group.  (App. Ex. A at ¶¶ 50-62; Probable Cause Affidavit, App. Ex. Q at ¶¶ 16-27).  Queen also found nineteen brass shell casings at the shooting location of the Viles group.  (App. Ex. Q at ¶ 22).  On approximately December 2, 2019, Queen issued a lengthy Investigative Report (with attachments), App. Ex. P).

On January 16, 2020, at the request of the Park County Attorney's Office, Queen reviewed and executed a Probable Cause Affidavit prepared by that Office.  (App. Ex. A at ¶ 65; App. Ex. Q).  The following day, a Deputy Park County Attorney filed Misdemeanor Informations against plaintiffs and submitted Queen's Probable Cause Affidavit to the court.    (Misdemeanor Informations, App. Exs. R and S).  The Park County Attorney's Office determined whether to file charges in the matter, what charges would be filed and against whom (if anyone) charges would be filed.  (App. Ex. A at ¶ 66).  Plaintiffs were acquitted on the charges selected by that Office following a four-day jury trial in 2020.  (ECF No. 2 at ¶¶ 18-19).

Against this backdrop, plaintiffs have asserted a Fourth Amendment malicious prosecution claim against Queen.  (ECF No. 2 at ¶ 32).  However, a prerequisite of such a claim cannot be met in this case.  In that regard, it is undisputed that plaintiffs were not detained (or seized) after legal process – the Misdemeanor Informations – was instituted against them.  The only detention they allege in this case occurred three months earlier, on October 27, 2019.  (ECF No. 2 at ¶¶ 7-10).  Consequently, plaintiffs cannot state a claim for Fourth Amendment malicious prosecution and summary judgment should be entered.[2]

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

The following undisputed material facts are established by the record and entitle Queen to summary judgment:

### Background

1.     Chris Queen was employed by the Wyoming Game & Fish Department ("WGFD") from 1994 until he retired in July, 2022.  (Queen Aff., App. Ex. A at ¶ 2).

2.     Queen became a Senior Game Warden for the Powell District in July, 2005 and served in that capacity continuously until his retirement.  (App. Ex. A at ¶ 3).  The Powell District included the northern half of Heart Mountain.  (*Id.*).  Heart Mountain was in elk hunt area 54. (*Id.*). Elk hunt area 54 has several license types. (*Id.*).  Type Six is an additional cow/calf elk only license type. (*Id.*).

3.     Queen's job as a Senior Game Warden included three general categories of duties: law enforcement; wildlife management; and miscellaneous duties. (App. Ex. A at ¶ 4).

4.     Queen's law enforcement duties included: field contacts regarding hunting, fishing, and watercraft; engaging in wildlife violation investigations; conducting field forensics (including

---

[2] This case originated with the filing of a complaint in state court.  (*See* ECF No. 7 at 5).  Plaintiffs asserted a state law malicious prosecution claim in their complaint, but it was dismissed as time-barred.  (*Id.* at 137).

performing necropsies and firearm ballistics analysis); enforcing Wyoming Statutes Titles 23 and 41 and Wyoming Game and Fish Commission regulations; and issuing citations and making arrests for violations of these statutes and regulations. (App. Ex. A at ¶ 5).

5.      Wyoming Statutes § 23-3-402 makes a violation of a lawful order of the Wyoming Game and Fish Commission ("WGFC") a misdemeanor.  (App. Ex. A at ¶ 8).  Harvesting more animals than the number of licenses in the possession of the hunter is a violation of Wyoming Game and Fish Commission Regulations Chapter Two, Section Three.  (*Id.* at ¶ 9). This is known as an over limit.  (*Id.*).  Taking a bull elk on an elk hunt area 54 type 6 license was prohibited by Wyoming Game and Fish Commission Regulations Chapter 7 Section 2, which only allows the taking of a cow or calf on an area 54 type 6 license.  (*Id.* at ¶ 10).  Taking a bull elk on a cow/calf license is known as a wrong sex violation. (*Id.*).

6.      Wyoming Statutes § 23-3-303(a) provides: "No person shall take and leave, abandon or allow any game bird, game fish, or game animal except trophy game animal, or edible portion, to intentionally or needlessly go to waste."  (App. Ex. A at ¶ 11).

7.      Queen held a "Brown Card" throughout his employment with the Wyoming Game and Fish Department.  (App. Ex. A at ¶ 12; Brown Card, App. Ex. "B").  The Brown Card authorized Queen to take wildlife pursuant to certain WGFC regulations.  (App. Ex. A at ¶ 12; App. Ex. "B"). Under Chapter 56, Section 3, he was authorized to take wildlife if he made a determination that, "wildlife has sustained an injury or contracted a disease or parasite which is life threatening to the individual animal or the wildlife population."  (App. Ex. A at ¶ 12).

8.      Brett Richmond is the owner of an outfitting company called Richmond Ranch, LLC, known to Queen as Richmond Ranch Outfitting. (Richmond Dep., App. Ex. T at 6:11-13, 19-23; 7:5-10; App. Ex. A at ¶ 14)  Richmond had access to hunt on the Two Dot Ranch on Heart

5

Mountain and frequently offered guided hunts there.  (App. Ex. A at ¶ 14). Many hunters refer to Brett Richmond's hunting parties as the Two Dot Guys.  (Queen Dep., App. Ex. DD at 164:10-18; App. Ex. A at ¶ 16). The green gate, which is also known as the corrals, was a common place to meet Brett Richmond's hunters.  (App. Ex. A at ¶ 16).  In 2019, Tyler Viles was a guide for Brett Richmond and guided hunts for elk that year.  (*See* Viles Dep., App. Ex. U at 9:2-11; App. Ex. A at ¶ 15).

9.      Plaintiffs Blendi Cumani and Roland Shehu, were clients of Brett Richmond's outfitting company.  (Cumani Dep., App. Ex. W at 26:9-16; Shehu Dep., App. Ex. Y at 26:18-24).

10.     On several occasions over his years as a Senior Game Warden in the Powell District, Queen learned that hunters being guided by Richmond Ranch Outfitting had illegally shot bull elk on cow/calf elk licenses or antlerless elk licenses.  (App. Ex. A at ¶ 16).  In the two weeks prior to October 27, 2019, there were two incidents in which Richmond's hunters shot bull elk on cow elk tags or antlerless elk tags.  (*Id.*; App. Ex. U at 20:23-25; 21:1-13; Queen Trial Test., App Ex. EE at 8:18-22).   In 2019, at least four bulls were harvested by hunters with Richmond Outfitting on cow tags.  (App. Ex. U at 21:14-18).

11.     In 2019, Brian Peters was the Manager of The Nature Conservancy's Heart Mountain Ranch. (App. Ex. A at ¶ 17; Worstell Trial Test., App. Ex. CC at 143:11-15).  Over the years, Queen had contact with Peters on numerous occasions in the course of his work as a Senior Game Warden. (App. Ex. A at ¶ 17).  Based on Queen's experience with Peters, his information was very reliable and detailed.  (App. Ex. A at 17; App. Ex. EE at 337:18-24).

## Events of October 27, 2019

12.     On the morning of October 27, 2019, Tyler Viles guided Blendi Cumani, Roland Shehu, and, George Schnell on an elk hunt on Heart Mountain.  (App. Ex. U at 38:2-16).

13.     On October 27, 2019, a few minutes after 8:00 a.m., Chris Queen was working in the Sunlight area when he received a phone call from Brett Richmond.  (App. Ex. EE at 200:5-ll, 18-24; 203:6-9; App. Ex. DD at 143:19-25; 144:24-145:1; App. Ex. A at ¶ 18).  Richmond told Queen that Tyler Viles was guiding a group of hunters on Heart Mountain, and one of the hunters had shot a bull elk on an antlerless elk license. (App. Ex. A at ¶ 18; App. Ex. EE at 200:20-24, 201:1-9).  Richmond texted Viles's phone number to Queen. (App. Ex. EE at 201:4-7, 14-19; App. Ex. DD at 144:4-9).

### Phone Call from Brian Peters

14.     Around the time Queen talked with Richmond, he received a call from Brian Peters. (App. Ex. EE at 203:10-16; App. Ex. A at ¶ 19).

15.     During this phone call, Peters told Queen that he was observing hunters on Heart Mountain and had heard a group of shots and then observed a herd of elk running away from behind a ridge. (App. Ex. A at ¶ 19). As the herd of elk progressed, Peters observed a cow elk and a bull elk fall behind and act as if they were wounded. (App. Ex. A at ¶ 19; App. Ex. DD at 156:19-20, 24-25).

16.     Peters was talking to Queen as he was watching the elk move. (App. Ex. A at ¶ 19). Peters mentioned to Queen that Heath Worstell was in the area. (App. Ex. A at ¶ 19; App. Ex. DD at 158:15-18). Peters told Queen that he would continue to watch the herd of elk and the wounded elk. (App. Ex. A at ¶ 19).

### Conversation with Tyler Viles

17.     After his initial conversation with Peters, Queen called Tyler Viles at 8:09 a.m. (App. Ex. A at ¶ 22). Queen was unable to originally contact Viles, but received a phone call back shortly afterwards. (App. Ex. A at ¶ 22).

18.     Viles said that one of the hunters with a cow elk license had shot a bull elk.  (App. Ex. A at ¶ 23). Viles also told Queen that his hunters had killed two other cow elk and they were beginning to quarter the elk to remove them from the field. (App. Ex. A at ¶ 23). The hunters had thus killed a total of three elk. (App. Ex. A at ¶ 23). Queen wanted to go to the area where the bull was killed. (App. Ex. A at ¶ 24). He also needed to cite the hunter who had illegally shot the bull elk on a cow license. (App. Ex. A at ¶ 24). He asked Viles if his hunters could remove the head of the illegally harvested bull elk. (App. Ex. A at ¶ 24; App. Ex. U at 53:15-20; Viles Trial Test., App. Ex. V at 188:9-20). He agreed to meet with Viles and the hunters at the green gate as soon as he could get there. (App. Ex. A at ¶ 24; App. Ex. U at 54:4-9; App. Ex. V at 187:20-25, 188:9-20).

19.     Based on his conversations with Richmond, Viles, and Peters, Queen had concerns as to whether Viles's group of hunters had fired the shots that Peters heard and if they were responsible for the wounded elk Peters observed. (App. Ex. A at ¶ 25).

20.     As detailed below, Queen subsequently performed an extensive investigation and issued a lengthy investigative report with numerous attachments.  (App. Ex. A at ¶¶ 26-63; Investigative Report (with attachments), App. Ex. P).  On January 16, 2020, at the request of the Park County Attorney's Office, Queen reviewed and executed a Probable Cause Affidavit prepared by that Office.  (App. Ex. A at ¶ 65; Probable Cause Affidavit, App. Ex. Q).  The following day, a Deputy Park County Attorney filed Misdemeanor Informations against plaintiffs and submitted Queen's Probable Cause Affidavit to the court.  (Misdemeanor Informations, App. Exs. R and S). The Park County Attorney's Office determined whether to file charges in the matter, what charges would be filed and against whom (if anyone) charges would be filed.  (App. Ex. at 65).

21.     Plaintiffs do not claim they were arrested, incarcerated or otherwise seized after the

Misdemeanor Informations were filed.

## Heath Worstell's Observations

22.     Because of poor cell reception, Queen was unable to call Heath Worstell until around 9:00 a.m. on October 27, 2019. (App. Ex. A at ¶ 26).  They talked for around 20 minutes. (App. Ex. A at ¶ 26).

23.     Queen's main objective of the phone call was to identify who had elk licenses in the Worstell party and if any of the licensed hunters had shot at elk that morning. (App. Ex. A at ¶ 27).

24.     Worstell said he was with his wife and son who had elk licenses in the Heart Mountain area and that they had not shot at any elk. (App. Ex. A at ¶ 27). Worstell did not have an elk license. (*Id.*). He said that he had seen the "Two Dot guys" shooting.  (*Id.*).  Worstell told Queen there were four people in the group that shot towards the elk. (*Id.*).  He had been concerned that they were shooting towards him. (*Id.*). Worstell indicated that the shooting had occurred in a common elk travel corridor with which Queen was familiar. (*Id.*).

25.     When Worstell called the group the "Two Dot guys," Queen understood Worstell to be referring to individuals hunting with Richmond Ranch Outfitting. (App. Ex. A at ¶ 28). Worstell's statement, together with the previous conversations Queen had with Richmond, Viles and Peters, indicated to Queen that Viles and his clients may have been the individuals shooting at the elk herd, and that their shooting may have resulted in the wounded elk Peters observed.  (*Id.*).

## Additional Conversations with Peters

26.     Queen had several other conversations with Brian Peters on the morning of October 27, 2019.  (App. Ex. A at ¶ 20). The conversations occurred between the first call and Queen's arrival at the green gate on Heart Mountain at 10:30 a.m. (*Id.*).  Peters told Queen that the wounded

cow elk and bull elk Peters had identified earlier had entered a draw and had not exited the draw with the rest of the herd. (*Id.*).  The facts Peters relayed during their conversations caused Queen to believe that the wounded cow elk and bull elk had probably been shot when Peters had heard gunfire. (*Id.*). Peters told Queen that he had not seen any hunter follow up on the wounded elk he had observed. (*Id.*).

<strong>The Green Gate</strong>

27.    Queen met Viles and his group of hunters – Blendi Cumani, Roland Shehu, and George Schnell – at the green gate at around 10:30 a.m. on October 27, 2019. (App. Ex. A at ¶ 30; App. Ex. EE at 114:21-24). Queen initially had a conversation with Viles about the bull killed on the cow license. (App. Ex. A at ¶ 31). Viles identified George Schnell as the hunter who had illegally killed the bull on the cow license. (App. Ex. A at ¶ 31). The general hunting location Viles described to Queen matched the description of the location both Peters and Worstell had mentioned in Queen's early conversations with them. (*Id.*).

28.    Queen asked Cumani, Shehu, and Schnell for their elk licenses, which is routine for a field interaction with hunters.  (App. Ex. A at ¶ 32; App. Ex. U at 59:2-4; 60:16-20; 61:16-25-62:1; App. Ex. V at 199:15-16).  Cumani had two validated elk hunt area 54 type 6 cow/calf elk licenses.  (App. Ex. A at ¶ 32; App. Ex. V at 199:18-19; App. Ex. U at 59:2-4).  Shehu had one unvalidated elk hunt area 54 type 6 cow/calf elk license.  (App. Ex. A at ¶ 32; App. Ex. V at 199:19-20).  Schnell had one validated elk hunt area 54 type 6 cow/calf elk license.  (App. Ex. A at ¶ 32; App. Ex. V at 199:16-18).  Cumani, Shehu and Schnell had a total of four licenses.  (App. Ex. A at ¶ 32).

29.    Queen asked to see the guns Cumani, Shehu and Schnell had been shooting.  (App. Ex. A at ¶ 35).  Cumani produced a Gunwerks 6.5-284 rifle, Shehu produced Tyler Viles's 6.5-

284 rifle and George Schnell produced a Cooper Arms .30-06 rifle.  (*Id.*).  Queen wrote down the

serial numbers of Cumani's and Schnell's rifles and identified Shehu's rifle as "Ty's rifle", because

he wanted to be able to identify those guns later if he found a bullet from the wounded elk Peters

had observed.  (*Id.*).

30.     In summary, Queen had the following information at the time he allegedly ordered

plaintiffs to go to Richmond's house and stay there:  (1) at 8:00 a.m. Brett Richmond had reported

his hunter had shot an illegal elk and told Queen to contact Tyler Viles; (2) within minutes of

Richmond's call, Brian Peters had told Queen that he heard shots and observed two wounded elk;

(3) Heath Worstell had told Queen that his wife and son did not  shoot at elk, but observed the

Two Dot guys shooting; (4) many hunters refer to Brett Richmond's hunting parties as the Two

Dot Guys; (5) Tyler Viles had told Queen that his hunters had shot at elk and killed three elk; (6)

the area that Worstell and Peters had described in their conversations with Queen matched up with

the location Viles described as the Viles group's shooting location; (7) the only other hunters

known to Queen to have been hunting in the area, Worstell and his family, had denied they shot at

any elk; (8) Richmond Ranch Outfitting had some history of its clients committing hunting

violations, including on the day in question; (9) the Viles group had four cow licenses; (10) if the

Viles group of hunters had shot the two wounded elk observed by Peters, that would place them

over-limit by one elk and also constitute another wrong-sex violation; (11) Cumani, Shehu and

Schnell were in the Viles group; and (12) Cumani, Shehu and Schnell lived out-of-state and

planned to leave Wyoming that day. (App. Ex. A at ¶¶ 18-20, 22-35).

31.     Queen suspected that Viles's group of hunters may have wounded the cow elk and

the bull elk that Brian Peters had described. (App. Ex. A at ¶ 34). Because none of the hunters

possessed an antlered elk license, and one of the wounded animals Peters had observed was a bull,

Queen also suspected that one of Viles's group of hunters may have shot a wrong sex elk. (*Id.*). Because a total of five elk – the three admittedly shot by Viles's group and the two wounded elk seen by Peters – were involved, and the Viles group only had four licenses, Queen also suspected a member of that group may have shot an over-limit of elk. (*Id.*).

32.     Queen told the hunting party that he had identified a couple of other elk that had been wounded. (App. Ex. EE at 322:6-11; App. Ex. W at 45:2-4; App. Ex. Y at 56:13-20).  At that point, he needed to leave the green gate to search for the wounded elk to gather evidence of potential crimes. (App. Ex. A at ¶ 36).  If Queen found the elk, he also needed to determine whether they had sustained injuries that would be life threatening and needed to be put down for humane purposes.  (*Id.*). In that event, his intentions were to shoot the elk and preserve the carcasses for consumption pursuant to WGFC regulations and his Brown Card. (*Id.*).

33.     According to Cumani and Shehu, Queen ordered them to go to Richmond's house and not to leave. (App. Ex. W at 46:1-10; App. Ex. Y at 57:1-6, 15-22).[3]  Queen wanted to be able to interview Cumani, Shehu, and Schnell and seize their guns if he located a bullet from the wounded elk Peters had observed. (App. Ex. A at ¶ 38).  Queen did not remove his handgun from his holster or handcuff anybody. (App. Ex. U at 63:1-9).  While the guns were potential evidence of a crime, I did not seize them at the green gate as a matter of courtesy and consideration to the hunters.  (App. Ex. A at ¶ 38).

34.     At approximately 11:00 or 11:30 a.m., Queen left with Tyler Viles so Viles could show Queen the exact shooting location. (App. Ex. A at ¶ 39; App. Ex. EE at 324:3-12; App. Ex. U at 65:22-25; App. V at 201:7-15).  The trip up and back took about 30 to 45 minutes. (App. Ex.

---

[3] For purposes of summary judgment, only, this allegation is assumed.  Queen denies that he ordered Cumani, Shehu or Schell to go to any location, to go to Richmond's house, to not leave the county, or to not leave the state. (App. Ex. A at ¶ 38).  According to Queen, he asked the three of them to remain in the area and Cumani and Schnell agreed to do so; Shehu said nothing in response).  (*Id.* at ¶ 37).

A at ¶ 39; App. Ex. DD at 147:14-18). During this trip they stopped briefly on the way up and way back to talk to a hunter named Kade Fitzgerald, and his grandfather. (App. Ex. A at ¶ 39; App. Ex. U at 66:20-25; App. Ex. V at 202:1-8). Queen checked Kade's license and asked him if he had shot at any elk. (App. Ex. A at ¶ 39; App. Ex. U at 67:2-8). Kade told Queen he had not shot any elk. (App. Ex. A at ¶ 39). Kade's grandfather was not hunting. (*Id.* at ¶ 40). Queen and Viles did not spend much time at the shooting location. (App. Ex. EE at 336:12-15). They drove up, Tyler pointed out the location where his hunters had shot from, and they turned around and left. (App. Ex. EE at 336:12-15; App. Ex. U at 67:16-25; 68:1-2).

35.   Upon returning to the green gate, Queen left immediately to meet with Brian Peters. (App. Ex. A at ¶ 40).

### Wounded Elk

36.   Queen met with Brian Peters at The Nature Conservancy to look for the wounded elk at about 12:30 or 1:00 p.m. (App. Ex. A at ¶ 40; Peters Trial Test., App. Ex. AA at 156:14-19; App. Ex. EE at 218:10-11).

37.   Peters observed a wounded cow elk, referred to in Queen's Investigative Report as elk #6. (App. Ex. A at ¶ 41; App. Ex. DD at 157:8-15; App. Ex. EE at 220:11-17).

38.   Elk #6 had separated from the main herd, which continued south and over the top of a ridge. (App. Ex. A at ¶ 41). This behavior indicated to Queen that this elk was seriously injured. (*Id.*). In his experience, a healthy elk would have stayed with the herd. (*Id.*).

39.   Queen found the cow elk bedded down. (App. Ex. A at ¶ 41; App. Ex. EE at 220:9-17). She was about 100 yards away when Queen first saw her. (App. Ex. EE at 220:9-17). She did not get up when he approached to within fifty yards. (App. Ex. A at ¶ 41; App. Ex. EE at 220:9-17). Based on Queen's experience as a game warden, a healthy elk, especially from a herd

hunted this heavily, would have immediately gotten up and run away.  (App. Ex. A at ¶ 41; App. Ex. EE at 221:9-19).

40.     Based on these observations, Queen concluded that the elk was wounded, could no longer stand or travel, and would likely die.  (App. Ex. A at ¶ 41).  At this point he dispatched elk #6 pursuant to his legal authority reflected in his Brown Card.  (App. Ex. A at ¶ 41; App. Ex. B). Queen shot and killed the cow elk between 12:30 and 12:45.  (App. Ex. DD at 42:4-11).

41.     After dispatching elk #6, Queen went up to it and examined it. (App. Ex. A at ¶ 42).  Elk #6 had a compound fracture to its right front leg above the knee joint.  (*Id.*; App. Ex, EE at 222:2-4).  When able to physically examine the wound, Queen determined that the veins and arteries had not stopped bleeding, and the wound was not dried out.  (App. Ex. A at ¶ 42).  If the animal is still alive and the wound is older than a couple of hours, it will stop bleeding.  (*Id.*).  If you do not see fresh drippings of blood the blood is coagulating.  (*Id.*).  Over time, tissue will dry up and become dirty and shriveled back.  (*Id.*).  Queen's observations indicated to him that the elk had been wounded within the last few hours.  The bone was fragmented in a spider web pattern. (*Id.*).  A portion of the leg was only attached by skin and tendons.  (*Id.*).  The aggressive spider web pattern of the fracture was consistent with a bullet exploding and fragmenting.  (*Id.*).  Based on his experience, a blunt force fracture does not lead to the extreme fragmentation Queen observed.  (*Id.*).  Queen concluded that the wound to elk #6 was a fresh bullet wound.  (*Id.*).

42.     At this point, Peters and Queen separated.  (App. Ex. EE at 228:10-11). Peters followed the backtrack of the cow elk.  (*Id.* at 228:11-12).  After finding elk #6, Queen proceeded to the top of a ridge to look for the wounded bull elk Peters had observed earlier. (App. Ex. A at ¶ 43; App. Ex. EE at 228:12-15).  According to Queen, he found a wounded bull elk (referred to in his Investigative Report as Elk #7).  (App. Ex. A at ¶ 43).  Queen dispatched (shot and killed) the

bull elk at approximately 1:00 p.m.  (App. Ex. DD at 41:18-20).  However, Richmond alleges that

he and Viles watched Queen shoot the elk and the elk was not wounded.[4]  (App. Ex. T at 72:20-

73:9).  For purposes of summary judgment, only, Queen assumes that Elk #7 was not wounded.

43.      Queen looked for bullets out of the elk #6 and elk #7with a metal detector, but did

not recover bullets out of the elk.  (App. Ex. EE at 307:16-21).

44.      After dispatching both elk, he field dressed them by removing the vital organs.

(App. Ex. A at ¶ 45).

45.      After recovering the elk, Queen and Peters loaded them up into Queen's truck at

around 4:30 that afternoon.  (App. Ex. EE at 230:3-231:6; Worstell Trial Test., App. Ex. CC at

157:8-23).

46.      From the time Queen arrived at the Green Gate on the morning of October 27, 2019,

to the time he left, he did not hear any gunshots.  (App. Ex. A at ¶ 46; App. Ex. EE at 364:22-25;

365:1, 12-14).  Queen did not hear any shooting while looking for the wounded elk.  (App. Ex. EE

at 364:22-25; 365:1-5).  With the exception of driving to meet Peters, Queen was never farther

than a few miles from the shooting location. (App. Ex. at ¶ 46).

### Richmond's House

47.      Queen then drove to Brett Richmond's house. (App. Ex. A at ¶ 45).  It took about

forty minutes to get to Richmond's house from where Queen loaded the elk into his truck.  (App.

---

[4] Richmond acknowledges that he did not see Queen shoot the first elk (elk #6).  (App. Ex. T at 73:9).  In his deposition, Viles testified that he watched Queen for a time, but Queen disappeared into a draw and he was unable to see Queen. (App. Ex. U at 71:1-4, 76:21-77:2).  Viles testified that he later heard two shots, but did not see who was shooting, what the person was shooting at or where the shot impacted.  (App. Ex. U at 77:3-14; 77:18-19; 78:5-20).

Ex. A at ¶ 47). He arrived at Richmond's house around no later than 6:00 p.m. on October 27, 2019.[5] (App. Ex. A at ¶ 47; App. Ex. EE at 349:13-15; App. Ex. W at 54:22-25).

48.     When Queen arrived at Richmond's house, plaintiffs were inside.  (App. Ex. A at ¶ 47).  Queen knocked on the door. (App. Ex. X at 354:17-25).  Richmond answered and went outside.  (*Id*). Queen had a conversation with Richmond and Viles.  (*Id.*).  After a while, plaintiffs came out.  (App. Ex. W at 55:6-14; App. Ex. Y at 78:17-25).

49.     Queen briefly talked to Cumani and Shehu before they left Richmond's house. (App. Ex. A at ¶ 47).  This discussion occurred no later than 6:30 or 7:00 p.m. (App. Ex. Y at 78:13-16). Plaintiffs left no later than 7:30 p.m. on October 27, 2019.  (App. Ex. W at 56:13-17). Cumani made it back to North Dakota to perform a scheduled surgery the next morning.  (App. Ex. W at 51:4-17; 56:16-20).

50.     Queen did not seize any guns as evidence because, while he had found what appeared to be bullet wounds in elk #6 and elk #7, he had not found any bullets.  (App. Ex. A at ¶ 48).

### October 28, 2019 Investigation

51.     On the morning of October 28, 2019, Queen visited the location identified by Viles as the shooting location.  (App. Ex. A at ¶ 50; App. Ex. EE at 233:11-15).

52.     Queen followed a side-by-side trail to the carcasses.  (App. Ex. A at ¶ 50; App. Ex. EE at 236:2-11; Probable Cause Affidavit, App. Ex. Q at ¶ 17).  Queen found the three quartered elk carcasses.  (App. Ex. EE at 236:12-13; App. Ex. Q at ¶ 17).  Two of the three carcasses still had heads attached and were identified as cow elk (elk #3 and elk #4).  (App. Ex. Q at ¶ 17).  The third carcass was a headless elk carcass that Queen assumed was the bull elk killed by Schnell (elk

---

[5] Queen testifies in his affidavit herein that he arrived at Richmond's house at around 5:00 p.m. (App. Ex. A at ¶ 47). Other witnesses have testified that Queen arrived at 6:00 p.m.

#5).  (App. Ex. Q at ¶ 17).

53.     There was fresh snow from the day before, either the night of October 26, 2019 or the morning hours of October 27, 2019.  (App. Ex. EE at 237:21-24; App. Ex. Q at ¶ 17).  There was no new snow that had fallen from the time that Schnell had killed the bull and Cumani had killed the cows.  (App. Ex. EE at 237:21-25; 238:1-5; App. Ex. Q at ¶ 17).  There was about four inches of snow on the ground.  (App. Ex. EE at 238:6-17).

54.     Queen was able to distinguish tracks made on October 27, 2019 and his track made on October 28, 2019 by a thin layer of frost in the impressions made on October 27.  (App. Ex. Q at ¶ 18).

55.     Queen walked north to pick up the elk trail.  (App. Ex. EE at 240:11-13; 356:3-6; App. Ex. Q at ¶ 18).  Queen found a bloody elk track almost immediately.  (App. Ex. EE at 241:9-13; 356:3-9; App. Ex. Q at ¶19).

56.     Queen began to follow the elk track.  (App. Ex. EE at 242:11-16).  This track traveled on the right side of the herd as the trail traveled east and left a significant amount of blood on the snow with every leap.  (App. Ex. EE at 242:9-24; 243:1-3; App. Ex. Q at ¶ 19).

57.     Queen followed the blood trail for approximately 3/8 mile until it entered the main elk trail.  (App. Ex. EE at 246:5-18; 356:10-17; App. Ex. A at ¶ 55; App. Ex. Q at ¶ 19).  He believed this elk track was from one of the crippled elk, which he had found on October 27, 2019.  (App. Ex. A at ¶ 55; App. Ex. EE at 246:5-12).

58.     Queen found one man track that walked right to the spot of blood.  (App. Ex. EE at 243:4-10; App. Ex. Q at ¶ 19).  It turned 180 degrees and went back to an elk carcass. (App. Ex. EE at 243:12-16; App. Ex. Q at ¶ 19).  At this point, Queen believed that the elk was probably injured at the scene and left out of there leaving a blood trail. (App. Ex. EE at 244:5-9).

59.     Queen backtracked the elk trail from the carcasses west for approximately 200 yards.  (App. Ex. EE at 247:10-14; 356:14-20; App. Ex. Q at ¶ 19).  At this point, he noticed an object in the sagebrush that resembled an elk carcass.  (App. Ex. EE at 247:11-248:5; App. Ex. Q at ¶ 19).  He verified the object as an elk carcass (referred to as Elk #1 in his Investigative Report) with his binoculars.  (App. Ex. Q at ¶ 19).  While scanning the area, he found a second elk carcass (designated as elk #2) approximately 50 yards from the first.  (App. Ex. Q at ¶ 19).  This elk had been scavenged on and was laying left side down, right side up with a pretty sizable hole in its flank. (App. Ex. EE at 248:15-19).

60.     Queen suspected at this point that these elk were killed in same event as the three elk above them.  (App. Ex. EE at 251:12-17).

61.     At this point, Queen left the location to obtain tools to further the investigation and returned to the location two hours later with Game and Fish investigator Irah Leonetti.  (App. Ex. EE at 255:7-25; 256:1-7; App. Ex. Q at ¶ 20).

62.     Leonetti and Queen necropsied Elk #1, and found a bullet.  (App. Ex. EE at 256:8-21).  The entrance hole was in the forward part of the right shoulder in the middle of the chest cavity.  (App. Ex. EE at 258:2-15).  The bullet went through the chest cavity and removed the bottom third to half of this elk's heart.  (App. Ex. EE at 258:17-22).

63.     Queen found three pieces of the bullet, two pieces of lead, and a significant portion of the copper jacket of the bullet.  (App. Ex. EE at 259:2-21).  Queen determined that Elk #1 had died from a gunshot wound.  (App. Ex. EE at 256:19-21).

64.     It looked like elk #2 had been shot or it had a wound in the very center to the right butt under the tail.  (App. Ex. EE at 263:4-11).  It also had a wound in its right flank. (*Id.*). If there was a wound path through that animal by a bullet Queen would have discovered it if the elk had

not been scavenged. (App. Ex. EE at 263:16-22).

65.     Queen and Leonetti investigated the scene and determined the meat from both elk were spoiled and not salvageable for human consumption.  (App. Ex. Q at ¶ 20).

66.     Tracks and impressions in the snow suggested that three people had lain side by side in a prone position.  (App. Ex. Q at ¶ 21).  When interviewing the hunters on October 27, 2019, Queen examined their rifles and all three rifles were right-handed, bolt-action rifles.  (App. Ex. Q at ¶ 21).  This type of rifle action would typically eject an empty cartridge to the right and slightly rearward.  (*Id.* at ¶ 21).

67.     Queen found three depressions in the snow at the shooting location identified by Viles.  (App. Ex. A at ¶ 51).  Queen used a metal detector to find brass (spent rifle cartridge casings) from the shooting location.  (App. Ex. EE at 282:17-21; App. Ex. Q at ¶ 22).  He recovered a total of 19 rifle casings.  (App. Ex. EE at 282:22-24; App. Ex. A at ¶ 51; App. Ex. Q at ¶ 22).

68.     The far north shooting position was delineated as shooter position #1. (App. Ex. Q at ¶ 22). Leonetti and Queen, utilizing a metal detector, collected six (6) brass from this shooting position. (*Id.*). All brass from this location were head stamped "Lapua 6.5-284". (App. Ex. EE at 283:15-25, 284:1-4; App. Ex. A at ¶ 51; App. Ex. Q at ¶ 22).  Leonetti and Queen collected eleven (11) brass associated with the middle shooting position (shooter position #2). (App. Ex. Q at ¶ 22). Six (6) of these brass were head stamped "Hornady 6.5-284" and five (5) were head stamped "Lapua 6.5-284". (App. Ex. A at ¶ 52; App. Ex. EE at 284:9-18; App. Ex. Q at ¶ 22).  At shooter position #3 (far south), two (2) brass were collected, both head stamped "Hornady 30-06".  (App. Ex. EE at 282:25, 283:2-6; App. Ex. A at ¶ 52; App. Ex. Q at ¶ 22).

69.     The 6.5-284 casings coincided with the 6.5-284 rifles Cumani and Shehu had showed Queen.  (App. Ex. A at ¶ 51).  The .30-06 casings coincided with the .30-06 rifle Schnell

had showed Queen.  (*Id.*).

70.     The shell casings Queen located on October 28, 2019 were not tarnished. (App. Ex. A at ¶ 52). The shell casings were located to the right and rear of the impressions created by the shooters.  (*Id.*). This was consistent with how casings would eject from a right handed bolt action rifle.  (*Id.*).  They were located in three groupings consistent with three shooters.  (*Id.*). The brass in each grouping was also the same caliber.  (*Id.*). Many brass from the same head-stamp and caliber were located in the area where the brass should have been if the shooters were laying prone and shooting.  (*Id.*). This indicated to Queen that the brass were from the same shooters.  (App. Ex. A at ¶ 51).

71.     On October 29, 2019, Queen used an RCBS dial caliper to measure the bullet recovered from elk # 1.  (App. Ex. EE at 278:13-19; App. Ex. Q at ¶ 23).  The copper bullet jacket had separated from the lead core, leaving the jacket somewhat cone-shaped.  (App. Ex. Q at ¶ 23). Queen was able to measure the bullet at the very base and determined the bullet to be 0.265 inches in diameter.  (App. Ex. Q at ¶ 23).  Nosler reloading data shows that the bullet diameter for a 6.5-284 cartridge is 0.264 inches. (App. Ex. Q at ¶ 23).

72.     On October 29, 2019, Leonetti and Queen interviewed George Schnell by phone. (App. Ex. EE at 302:21-23; Queen Trial Test. II, App. Ex. EE-2 at 5:8-13; App. Ex. Q at ¶ 24). Schnell stated he took the bull elk with 2 shots.  (App. Ex. Q at ¶ 24). Any other shots he attempted to fire were misfires.  (App. Ex. EE-2, at 15:16-22; App. Ex. Q at ¶ 24).  Schnell indicated he was using 30-06 bullets.  (App. Ex. Q at ¶ 24).

73.     Queen returned to the shooting location on October 30, 2019, to determine whether elk #1 and elk #2 were visible from where the shooters had been located.  (App. Ex. EE-2 at 5:23-25, 6:1-2; App. Ex. EE at 266:3-7; App. Ex. Q at ¶ 25).  The carcasses were visible through a spotting scope.  (App. Ex. EE at 266:14-20; App. Ex. Q at ¶ 25).

74.     During his investigation, Queen contacted every individual he was aware of who hunted in the area of Heart Mountain at issue on October 27, 2019.  (App. Ex. A at ¶ 62; App. Ex. Q at ¶ 27).  The only individuals who reported having shot at elk were Cumani, Shehu, and Schnell. (App. Ex. A at ¶ 62).

75.     On approximately December 2, 2019, Queen submitted his Investigative Report to the Park County Attorney for him to determine whether to issue any charges in connection with the incidents of October 27, 2019.  (App. Ex. A at ¶ 64; App. Ex. P).

76.     At the request of the Park County Attorney's Office, Queen went to its office on January 16, 2020.  (App. Ex. A at ¶ 65).  When he arrived at the office, a legal assistant had typed up an Affidavit of Probable cause.  (*Id.*; App. Ex. DD at 110:5-12).  Queen reviewed and executed the Affidavit of Probable Cause.  (App. Ex. A at ¶ 65; App. Ex. DD at 109:22-26; 110:13-15; 112:10-16, 22-24; App. Ex. Q).

77.     The Park County Attorney's Office determined whether to file charges in the matter, what charges would be filed and against whom (if anyone) charges would be filed.  (App. Ex. A at ¶ 66).

## III.  LEGAL STANDARDS

### A.     SUMMARY JUDGMENT STANDARD.

Under Rule 56(a), Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In that regard, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Rule 1, Fed.R.Civ.P.).

As the Tenth Circuit Court of Appeals recently stated, "[n]o genuine issue of material fact exists unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *GeoMetWatch Corp. v. Behunin,* 38 F.4th 1183, 1200 (10th Cir. 2022) (internal quotation marks omitted). "For there to be a 'genuine' dispute of fact, there must be more than a mere scintilla of evidence, and summary judgment is properly granted if the evidence is merely colorable or is not significantly probative." *GeoMetWatch,* 38 F.4th at 1200 (internal quotation marks omitted). "And while we draw all reasonable inferences in favor of the non-moving party, an inference is unreasonable if it requires a degree of *speculation* and conjecture that renders [the factfinder's] findings *a guess or mere possibility*." *Id.* (internal quotation marks omitted) (alteration in original) (emphases in original).

"In this vein, statements of mere belief . . . must be disregarded at the summary judgment stage." *GeoMetWatch,* 38 F.4th at 1200. (internal quotation marks omitted) (alteration in original). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Id.* (internal quotation marks omitted). "Nor can the nonmovant defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion." *Id.* (internal quotation marks omitted). "Rather, [t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* at 1200-01 (internal quotation marks omitted) (alteration in original). "[T]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.,* 458 F.3d 1073, 1084 (10th Cir. 2006).

Further, "the mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Hooks v. Atoki,* 983 F.3d 1193, 1205 (10th Cir. 2020) (internal quotation marks omitted). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 322-23.

## B.     QUALIFIED IMMUNITY STANDARD.

The Tenth Circuit Court recently held as follows:

> Government officials sued under 42 U.S.C. § 1983 are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018). Courts have discretion to decide the order in which they address these two prongs and thus may address the clearly established prong first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know." *Id.* at 590 (citation omitted).

*Roberts v. Winder,* 16 F.4th 1367, 1373-74 (10th Cir. 2021).

"For the law to be clearly established, there ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must

point in one direction." *Pompeo v. Bd. of Regents of the Univ. of New Mexico,* 852 F.3d 973, 981

(10th Cir. 2017) (internal citation and quotation marks omitted). "[C]learly established law must

remain moored in a specific set of facts." *Crane v. Utah Dep't of Corr.,* 15 F.4th 1296, 1303 (10th

Cir. 2021). "The dispositive question is 'whether the violative nature of *particular* conduct is

clearly established,' which means courts may not 'define clearly established law at a high level of

generality.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12) (emphasis in original). "The plaintiff bears

the burden of citing to [the court] what he thinks constitutes clearly established law." *Id.* (internal

quotation marks omitted).

"When a defendant asserts qualified immunity at the summary judgment stage, it is the

plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was

clearly established at the time of the alleged violation." *Soza v. Demsich,* 13 F.4th 1094, 1099

(10th Cir. 2021). "Only when a plaintiff satisfies this heavy burden must the defendant then satisfy

the traditional summary judgment standard." *Id.*

## IV.  ARGUMENT

**A.    QUEEN IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' FALSE ARREST/DETENTION CLAIM.**

### 1.    Qualified immunity bars a claim that plaintiffs were arrested on October 27, 2019.

Plaintiffs claim that they were arrested by Queen in this case. (*See* ECF No. 2 at ¶ 31). In

that regard, they allege Queen ordered them to go to Richmond's house and stay there. (App. Ex.

W at 46:1-10; App. Ex. Y at 57:1-6, 57:15-22).[6]  However, "[a]n officer can detain a suspect

without arresting him." *Hemry v. Ross,* 62 F.4th 1248, 1256 (10th Cir. 2023). A detention may

constitute an investigative detention – not an arrest – and require only reasonable suspicion – not

---

[6] As noted, Queen denies that he did so. (App. Ex. A at ¶ 38).

probable cause. *Id.* at 1253.  Courts conduct a fact-intensive inquiry to distinguish between arrests and investigative detentions.  *Id.*  The "inquiry considers both the officers' forceful measures and the detention's length." *Id.* at 1254.

Queen did not use any forceful measures in this case – he did not brandish a weapon or handcuff plaintiffs.  (App. Ex. U at 63:1-9).  As for the length of time plaintiffs remained at the Richmond home, a Court considers "the purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Hemry,* 62 F.4th at 1256 (internal quotation marks omitted).  "In doing so, the law instructs [courts] to evaluate the length of a stop with an eye toward common sense and experience." *Id.* (internal quotation marks omitted).  "[A]n evaluation of the reasonableness of a detention's length is not an exercise in counting minutes." *Id.*  Moreover, "*[p]er se* rules do not have a place in such an analysis." *Id.* at 1256 n. 1.  Instead, [a court] probe[s] the factual context and the detention's underlying justification." *Id.* at 1256 (internal quotation marks omitted).  And where qualified immunity is asserted, "[the Supreme Court has] stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Id.* at 1253.

In this case, Queen was contacted about a hunting violation in the back country.  (App. Ex. A at ¶ 18).  Shortly thereafter, he received word of other possible hunting violations.  (*Id.* at ¶ 19). After meeting with Viles and his hunting party, Queen had a compelling need to go forward with his investigation, to search for the alleged wounded elk, determine their condition and dispatch them if necessary, to look for bullets in the animals and seize plaintiffs' guns and potentially interview them if he located bullets.  (App. Ex. A at ¶¶ 36-37).  At the same time, Queen knew plaintiffs were from out-of-state and were planning to leave Wyoming.  Queen did not take plaintiffs' guns at the scene (the green gate), which was perhaps a mistake.  (*Id.* at ¶ 37).  It is

under these circumstances that, according to plaintiffs, Queen ordered them to stay at a house while he did his work.  (App. Ex. W at 46:1-10; App. Ex. Y at 57:1-6, 57:15-22).

After leaving plaintiffs at the green gate, Queen was taken to the shooting location, questioned two people in the area, searched for the alleged wounded elk on the mountain, located, observed, dispatched and examined the elk, field dressed the elk, loaded them in his truck,  and then drove to Richmond's house.  (*See* App. Ex. A at ¶¶ 39-47).  These actions took time.[7]  Queen was diligent in performing his investigation.

To overcome qualified immunity, plaintiffs must identify a prior case in which an alleged detention at a private home was deemed an arrest under similar circumstances.  *Crane,* 15 F.4th at 1303.  "It is not enough that [a] rule is suggested by then-existing precedent."  *Roberts,* 16 F.4th at 1374 (internal quotation marks omitted).  "The dispositive question is whether the violative nature of *particular* conduct is clearly established[.]"  *Id.* (internal quotation marks omitted) (emphasis in original).  Applying these principles, it was not clearly established that Queen's conduct constituted an arrest in this case.  Further, as demonstrated below, reasonable suspicion existed for plaintiffs' alleged investigative detention.  Consequently, Queen is entitled to summary judgment on plaintiffs' false arrest and detention claim.

**2.    Queen is entitled to qualified immunity because he had arguable probable cause for the plaintiffs' alleged arrest.**

As the Tenth Circuit Court has observed, probable cause does not require proof beyond a reasonable doubt.  *Kerns v. Bader,* 663 F.3d 1173, 1188 (10th Cir. 2011).  "It does not even require the suspect's guilt to be 'more likely true than false.'"  *Id.* (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983).  Instead, "[t]he relevant question is whether a substantial probability existed that the

---

[7] The United States Supreme Court has held a sixteen-hour detention was reasonable under the particular circumstances of a case.  *U.S. v. Montoya de Hernandez,* 473 U.S. 531, 542-44 (1985).

suspect committed the crime, requiring something more than a bare suspicion." *Pollack v. Miller,*

859 F. App'x 856, 860 (10th Cir. 2021) (internal quotation marks omitted). "And when qualified

immunity is raised as a defense, [a court] ask[s] only whether there was *arguable* probable cause,

such that a reasonable officer *could* have believed that probable cause existed." *Id.* (internal

quotation marks omitted) (emphasis in original).

"Further, the answer to that question turns not on whether [the defendant law enforcement

officers] subjectively knew or believed they lacked actual probable cause to arrest [plaintiff] but

on whether, as a purely objective matter, 'a reasonable officer' in the defendants' position 'could

have believed that probable cause existed' to support [plaintiff's] arrest." *Bailey v. Twomey,* 791

F. App'x 724, 731 (10th Cir. 2019) (quoting *Culver v. Armstrong*, 832 F.3d 1213, 1218 (10th Cir.

2016). "Likewise, . . . [an officer's] 'underlying intent or motivation is irrelevant to the Fourth

Amendment inquiry[.]'" *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989).

In this case, Queen had the following information at the time he allegedly ordered plaintiffs

to go to Richmond's house and stay there:

> (1) at 8:00 a.m. Brett Richmond had reported his hunter had shot an illegal elk and
> told Queen to contact Tyler Viles; (2) within minutes of Richmond's call, Brian
> Peters had told Queen that he heard shots and observed two wounded elk; (3) Heath
> Worstell had told Queen that his wife and son did not  shoot at elk, but observed
> the Two Dot guys shooting; (4) many hunters refer to Brett Richmond's hunting
> parties as the Two Dot Guys; (5) Tyler Viles had told Queen that his hunters had
> shot at elk and killed three elk; (6) the area that Worstell and Peters had described
> in their conversations with Queen matched up with the location Viles described as
> the Viles group's shooting location; (7) the only other hunters known to Queen to
> have been hunting in the area, Worstell and his family, had denied they shot at any
> elk; (8) Richmond Ranch Outfitting had some history of its clients committing
> hunting violations, including on the day in question; (9) the Viles group had four
> cow/calf elk licenses; (10) if the Viles group of hunters had shot the two wounded
> elk observed by Peters, that would place them over-limit by one elk and constitute
> another wrong-sex violation; (11) Cumani, Shehu and Schnell were in the Viles
> group; and (12) Cumani, Shehu and Schnell lived out-of-state and planned to leave
> Wyoming that day.

(*See* App. Ex. A at ¶¶ 18-20, 22-35).

Based on the foregoing information, arguable probable cause existed for the Viles group's alleged arrest – "a reasonable officer *could* have believed that there was probable cause" of over-limit and wrong-sex violations.  *Pollack,* 859 F. App'x at 860 (emphasis in original).  And the Tenth Circuit Court has held that it is not clearly established that "an officer could not arrest an entire small group when he knows some unidentifiable members, if not all members, of the group have committed a crime."  *Callahan v. Unified Gov't of Wyandotte Cnty.,* 806 F.3d 1022, 1028-30 (10th Cir. 2015); *accord Valdez v. Derrick,* 681 F. App'x 700, 703-04 (10th Cir. 2017).  To the contrary, "[t]his question of probable cause in multi-suspect situations is far from beyond debate." *Callahan,* 806 F.3d at 1028.  "[A court] cannot ask officers to make a legal determination–that law professors probably could not agree upon–without any guidance from the courts and then hold them liable for guessing incorrectly.  Qualified immunity exists to prevent exactly that."  *Id.* at 1030.  The *Callahan* court therefore reversed a denial of qualified immunity in that case.  *Id.*; *see also Valdez,* 681 F. App'x at 704 (likewise reversing a denial of qualified immunity in a multi-suspect case).

In light of *Callahan* and *Valdez*, this Court should grant Queen qualified immunity on plaintiffs' claim that Queen arrested them.  As shown above, arguable probable cause existed for the alleged arrest of the Viles group.  Consequently, the Court should grant summary judgment on the false arrest claim.

### 3.    Queen is entitled to qualified immunity because he had arguable reasonable suspicion for plaintiffs' alleged investigatory detention.

"An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime."  *U.S. v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012) (internal quotation

marks omitted).  The reasonable suspicion standard is lower than the probable cause standard.  *See Mocek v. City of Albuquerque,* 813 F.3d 912, 923 (10th Cir. 2015) ("[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.").  Indeed, "reasonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality.'" *Id.* (internal quotation marks omitted).  "In the context of a § 1983 action, moreover, the officer is entitled to qualified immunity if a reasonable officer could have believed that [reasonable suspicion] existed to ... detain the plaintiff—i.e., if the officer had "arguable reasonable suspicion." *Vondrak v. City of Las Cruces,* 535 F.3d 1198, 1207 (10th Cir. 2008) (internal quotation marks omitted) (alterations in original).

Applying these principles, the information set forth above gave Queen arguable reasonable suspicion in this case.  Queen is therefore entitled to qualified immunity as to plaintiffs' alleged investigatory detention.  Consequently, their false detention claim, like their false arrest claim, fails as a matter of law.  The Court should grant summary judgment.

**B.     BASED ON THE UNDISPUTED RECORD, QUALIFIED IMMUNITY BARS PLAINTIFFS' MALICIOUS PROSECUTION CLAIM BECAUSE PLAINTIFFS WERE NOT SEIZED AFTER THE INSTITUTION OF LEGAL PROCESS.**

"For a § 1983 malicious prosecution claim based on an alleged Fourth Amendment violation, the plaintiff must show:  (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Pollack v. Miller,* 859 F. App'x 856, 860 (10th Cir. 2021).  "Because this claim is housed in the Fourth Amendment, the plaintiff also has to prove that the malicious prosecution resulted in a seizure of the plaintiff." *Thompson v. Clark,* 596 U.S.

36, 43 n. 2 (2022); *accord Mata v. Anderson,* 635 F.3d 1250, 1254–55 (10th Cir. 2011); *Nielander*

*v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1165 (10th Cir. 2009).

In distinguishing false arrest claims from malicious process claims, the Tenth Circuit Court

has held as follows:

> **Unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only "[a]fter the institution of legal process."** *Mondragon v. Thompson,* 519 F.3d 1078, 1083 (10th Cir. 2008); *see also Wallace v. Kato,* 549 U.S. 384, 127 S.Ct. 1091, 1096, 166 L.Ed.2d 973 (2007) ("[A]fter [institution of legal process], unlawful detention forms part of the damages for the ... tort of malicious prosecution, which remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process."). In this context, a Fourth Amendment violation can exist only when a plaintiff alleges the legal process itself to be wrongful.

*Wilkins v. DeReyes,* 528 F.3d 790, 798 (10th Cir. 2008) (emphasis added); *accord Pollack,* 859 F.

App'x at 860.

The court has further explained:

> Depending on the circumstances of the arrest, a plaintiff can challenge the institution of legal process as wrongful in one of two ways. **If arrested without a warrant**—and thus triggering "the Fourth Amendment require[ment of] a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest," *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)—**a plaintiff can challenge the probable cause determination made during the constitutionally-required probable cause hearing.** *See, e.g., Reed v. City of Chicago,* 77 F.3d 1049, 1053–54 (7th Cir.1996) (concluding the plaintiff failed to state a malicious prosecution claim when he challenged only the warrantless arrest, but not the subsequent institution of legal process). Or, if arrested pursuant to a warrant, plaintiff can challenge the probable cause determination supporting the warrant's issuance.

*Id.* (emphasis added).

In this case, the sole seizure alleged by plaintiffs is their alleged arrest or detention on

October 27, 2019. (*See* ECF No. 2 at ¶¶ 7-10). There was no probable cause hearing regarding

their alleged arrest or detention; plaintiffs simply traveled home. Legal process was not instituted

against plaintiffs until nearly three months later, when the Misdemeanor Informations were filed

by the Deputy Park County Attorney.  (App. Exs. R and S).  Plaintiffs do not claim, as they cannot

claim, that they were subsequently seized.  In that regard, the Tenth Circuit Court has stated as

follows:

> For purposes of a malicious-prosecution claim a seizure must be either an "arrest
> or imprisonment."  *Becker [v. Kroll]*, 494 F.3d [904,] 914 (10th Cir. 2018).  In
> particular, we have rejected the argument that a seizure includes "requiring a person
> to post bond, compelling a person to appear in court, or imposing restrictions on a
> person's right to interstate travel."  *Becker*, 494 F.3d at 915.

*Leon v. Summit Cnty.,* 755 F. App'x 790, 796 (10th Cir. 2018); *see also Lewis v. Rock,* 48 F. App'x

291, 294 (10th Cir. 2002) (holding that attending trial is not a seizure for purposes of a malicious

prosecution claim).  Since it is undisputed that plaintiffs were not seized after the Misdemeanor

Informations were filed in this case, Queen is entitled to summary judgment on their malicious

prosecution claims.

At the very least, it is not clearly established that plaintiffs were seized in this case for

purposes of a malicious prosecution claim.  Consequently, Queen is also entitled to summary

judgment based on qualified immunity.

## V.  CONCLUSION

Based on the undisputed record, Queen is entitled to judgment on both of plaintiffs' claims

as a matter of law.  As to the false arrest/detention claim, it was not clearly established that Queen's

interactions with plaintiffs on October 27, 2019 constituted an arrest.  Moreover, Queen had

arguable probable cause to allegedly make an arrest and arguable reasonable suspicion for an

alleged investigatory detention of plaintiffs.  Finally, plaintiffs' malicious prosecution claim fails

because it is undisputed they were not seized after the initiation of legal process against them.

Accordingly, Queen's motion for summary judgment should be granted.

DATED this 11th day of March, 2024.

/s/Prentice B. Olive
Timothy W. Miller, Bar No. 5-2704
Senior Assistant Attorney General
Prentice B. Olive, Bar No. 8-6691
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-5820
(307) 777-3608
(307) 777-8920 Facsimile
tim.miller@wyo.gov
prentice.olive@wyo.gov

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I do hereby certify that on this 11th day of March, 2024, a true and correct copy of the foregoing **Memorandum in Support of Defendant's Motion for Summary Judgment** was served as indicated below:

Bradley L. Booke, Bar No. 5-1676                    [✓] CM/ECF
Law Office of Bradley L. Booke
P.O. Box 13160
Jackson, Wyoming 83002
brad.booke@lawbooke.com


/s/Kailie D. Harris
Kailie D. Harris, Paralegal
Office of the Wyoming Attorney General

33