## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| BLENDI CUMANI, M.D., and<br>ROLAND SHEHU, | )<br>) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 23-CV-55-ABJ |
| | ) |
| CHRIS QUEEN, | ) |
| | ) |
| Defendant. | ) |

---

## AFFIDAVIT OF CHRIS QUEEN

---

Chris Queen, being first duly sworn, deposes and states as follows:

1.      I have personal knowledge of the facts set forth in this affidavit.

2.      I was employed by the Wyoming Game & Fish Department ("WGFD") from 1994 through July 2022. I was certified as a peace officer in 1998 and retained that status until I retired in July, 2022. I served as a Senior Game Warden for the WGFD for over twenty-three years.

3.      I became a Senior Game Warden for the Powell District in July, 2005 and served in that capacity continuously until my retirement. The western border of my district was Yellowstone National Park, the northern border was Montana, the eastern border was Road 9 or Highway 295, and the southern border was on the hydrologic divide between Sunlight Creek and the North Fork of the Shoshone River. The Powell District included the northern half of Heart Mountain. Heart Mountain was in elk hunt area 54. Elk hunt area 54 has several license types. Type Six is a cow/calf elk only license type.

4.      My job as a Senior Game Warden included three general categories of duties: law enforcement; wildlife management; and miscellaneous duties.

EXHIBIT A

5.     My law enforcement duties included: field contacts regarding hunting, fishing, and watercraft; engaging in wildlife violation investigations; conducting field forensics (including performing necropsies and firearm ballistics analysis); enforcing Wyoming Statutes Titles 23 and 41 and Wyoming Game and Fish Commission regulations; and issuing citations and making arrests for violations of these statutes and regulations.

6.     My wildlife management duties included: wildlife surveys; animal classifications; setting seasons for big game animals; and conducting wildlife research.

7.     My miscellaneous duties included: public relations; education; responding to reports of injured wildlife; responding to damage caused by wildlife; capturing and immobilizing wildlife and other minor duties.

8.     Wyoming Statutes § 23-3-402 makes a violation of a lawful order of the Wyoming Game and Fish Commission (WGFC) a misdemeanor.

9.     Harvesting more animals than the number of licenses in the possession of the hunter is a violation of Wyoming Game and Fish Commission Regulations Chapter Two, Section Three. This is known as an over limit.

10.     Taking a bull elk on an elk hunt area 54 type 6 license was prohibited by Wyoming Game and Fish Commission Regulations Chapter 7 Section 2, which only allows the taking of a cow or calf on an area 54 type 6 license. Taking a bull elk on a cow/calf license is known as a wrong-sex violation.

11.     Wyoming Statutes § 23-3-303(a) provides: "No person shall take and leave, abandon or allow any game bird, game fish, or game animal except trophy game animal, or edible portion, to intentionally or needlessly go to waste."

12.     I held a "Brown Card" throughout my employment with the Wyoming Game and

Fish Department. The Brown Card authorized me to take wildlife pursuant to certain WGFC regulations. Pursuant to Chapter 56, Section 5 of the WGFC regulations, I was authorized to take wildlife under the circumstances set forth in Chapter 56, Section 3. Under Chapter 56, Section 3, I was authorized to take wildlife if I made a determination that, "wildlife has sustained an injury or contracted a disease or parasite which is life threatening to the individual animal or the wildlife population."

13.     The document submitted herewith as Exhibit "B" is a true and correct copy of my Brown Card that was in effect in October, 2019.

14.     I became familiar with Brett Richmond during my service as a Senior Game Warden in the Powell District. Richmond owned Richmond Ranch Outfitting in the Cody area and offered guided hunts for cow elk, including on Heart Mountain. Richmond had access to hunt on the Two Dot Ranch on Heart Mountain and frequently offered guided hunts there.

15.     I also became familiar with Tyler Viles, who guided hunts for Brett Richmond.

16.     On several occasions over my years as a Senior Game Warden in the Powell District, I learned that hunters being guided by Richmond Ranch Outfitting had illegally shot bull elk on cow/calf elk licenses or antlerless elk licenses. There were two such incidents in the three weeks preceding October 27, 2019. The green gate, which is also known as the corrals, was a common place to meet Brett Richmond's hunters. Local hunters refer to Richmond Ranch Outfitting and its guided hunters as "the Two Dot guys."

17.     In 2019, Brian Peters was the Ranch Manager of The Nature Conservancy. Over the years, I had contact with Peters on numerous occasions in the course of my work as a Senior Game Warden. Based on my experience with Peters, information from Peters was very reliable and detailed.

18.     On the morning of October 27, 2019 I was in the Sunlight Basin area when I received a call from Brett Richmond at just after 8:00 a.m. Richmond told me that Tyler Viles was guiding a group of hunters on Heart Mountain, and one of the hunters had unlawfully shot a bull elk on a type 6 license.

19.     Brian Peters called me as I was hanging up with Richmond, shortly after 8:00 a.m. on October 27, 2019. He told me that he was observing hunters on Heart Mountain and had heard a group of shots and then observed a herd of elk running away from behind a ridge. As the herd of elk progressed, he observed a cow elk and a bull elk fall behind and act as if they were wounded. He was talking to me as he was watching the elk move. Peters mentioned that Heath Worstell was in the area. Peters told me that he would continue to watch the herd of elk and the wounded elk. This call lasted for a few minutes.

20.     I had several other conversations with Brian Peters on the morning of October 27, 2019.  The conversations occurred between the first call and my arrival at the green gate on Heart Mountain at 10:30 a.m.   Peters told me that the wounded cow elk and bull elk he had identified earlier had entered a draw and had not exited the draw with the rest of the herd. The facts Peters relayed to me during our conversations caused me to believe that the wounded cow elk and bull elk had probably been shot when Peters had heard gunfire. Peters told me that he had not seen any hunter follow up on the wounded elk he had observed.

21.     I asked Brian Peters for a statement on October 29, 2019. I received Peters's statement within two weeks of October 27, 2019.  The document submitted herewith as Exhibit "C" is a true and correct of the statement I received from Brian Peters.

22.     After my initial conversation with Peters, I called Tyler Viles at 8:09 a.m. I was unable to originally contact Viles, but received a phone call back shortly afterwards.

23.     Viles said that one of the hunters with a cow elk license had shot a bull elk. Viles also told me that his hunters had killed two other cow elk and they were beginning to quarter the elk to remove them from the field. The hunters had thus killed a total of three elk.

24.     I wanted to go to the area where the bull was killed. I also needed to cite the hunter who had illegally shot wrong-sex elk. I asked Viles if his hunters could remove the head of the illegally harvested bull elk. I agreed to meet with Viles and his hunting party the green gate as soon as I could get there.

25.     Based on my conversations with Richmond, Viles, and Peters, I had concerns as to whether Viles's group of hunters had fired the shots that Peters heard and if they were responsible for the wounded elk Peters observed.

26.     Because of poor cell reception, I was unable to call Heath Worstell until around 9:00 a.m. on October 27, 2019. We talked for about twenty minutes.

27.     My main objective of the phone call was to identify who had elk licenses in the Worstell party and if any of the licensed hunters had shot at elk that morning. Worstell said he was with his wife and son who had elk licenses in the Heart Mountain area and that they had not shot at any elk. Worstell did not have an elk license. He said that he had seen the "Two Dot guys," and that they had shot a bunch. Worstell told me there were four people in the group that shot towards the elk. He had been concerned that they were shooting towards him. Worstell indicated that the shooting had occurred in a common elk travel corridor with which I was familiar.

28.     When Worstell called the group the "Two Dot guys," I understood Worstell to be referring to individuals hunting with Richmond Ranch Outfitting. Worstell's statement, together with the previous conversations I had with Richmond, Viles and Peters, indicated to me that Viles and his clients may have been the individuals shooting at the elk herd, and that their shooting may

have resulted in the wounded elk Peters observed.

29.     I asked Worstell for a statement on October 29, 2019. I obtained Worstell's statement within a month of October 27, 2019.  The document submitted herewith as Exhibit "D" is a true and correct copy of the statement I received from Worstell.

30.     I met Viles and his group of hunters – Blendi Cumani, Roland Shehu, and George Schnell – at the green gate at around 10:30 a.m. on October 27, 2019.

31.     I initially had a conversation with Viles about the bull killed on the cow license. Viles identified George Schnell as the hunter who had illegally killed the bull on the cow license. The general hunting location Viles described to me matched the description of the location both Peters and Worstell had mentioned in my early conversations with them. Viles told me that he had told his hunters to wait to start shooting until the elk were 400 yards away. He told me he wanted the elk to be close so that all his hunters could fill their licenses.

32.     I asked Cumani, Shehu, and Schnell for their elk licenses, which is routine for a field interaction with hunters. Cumani had two validated elk hunt area 54 type 6 cow/calf elk licenses. Shehu had one unvalidated elk hunt area 54 type 6 cow/calf elk license. Schnell had one validated elk hunt area 54 type 6 cow/calf elk license. Cumani, Shehu and Schnell had a total of four licenses.

33.     In summary, I had the following information at this point: (1) at 8:00 a.m. Brett Richmond had reported his hunter had shot an illegal elk and told me to contact Tyler Viles; (2) within minutes of Richmond's call Brian Peters told me he had heard shots and observed two wounded elk; (3) Tyler Viles told me that his hunters had shot at and killed three elk; (4) if the Viles group of hunters also shot the two wounded elk, that would place them over-limit; (5) Heath Worstell told me that his wife and son had not shot at elk, but had observed the Two Dot guys

shoot at a herd of elk and take a bunch of shots; (6) local hunters commonly referred to Richmond Ranch Outfitting hunters and guides as Two Dot guys; (7) the locations that Worstell and Peters had described in their conversations with me matched up with the location Viles described as the shooting location; (9) Viles was guiding Cumani, Shehu, and Schnell and had been referenced by Richmond as the guide to contact regarding Schnell's hunting violation; (10) I was not aware of any other hunters who had fired at elk in that area of Heart Mountain; and (11) Richmond Ranch Outfitting had some history of its clients committing hunting violations, including on the day in question.

34.     I suspected that Viles's group of hunters may have wounded the cow elk and the bull elk that Brian Peters had described and they had been abandoned. Because none of the hunters possessed an antlered elk license, and one of the wounded animals Peters had observed was a bull, I also suspected that one of Viles's group of hunters may have shot a wrong-sex elk. Because a total of five elk – the three admittedly shot by Viles's group and the two wounded elk seen by Peters – were involved, and the Viles group only had four licenses, I also suspected an overlimit. There was also the potential for an abandonment.

35.     I asked to see the guns Cumani, Shehu and Schnell had been shooting. Cumani produced a Gunwerks 6.5-284 rifle, Shehu produced Tyler Viles's Gunwerks 6.5-284 rifle and George Schnell produced a Cooper Arms .30-06 rifle. I wrote down the serial numbers of Cumani's and Schnell's rifles and identified Shehu's rifle as "Ty's rifle", because I wanted to be able to identify those guns later if I found a bullet from the wounded elk Peters had observed.

36.     At that point, I had to leave the green gate to search for the wounded elk to gather evidence of potential crimes. If I found the wounded elk, I also needed to determine whether they had sustained injuries that would be life threatening and needed to be put down for humane

purposes. In that event, my intentions were to shoot the elk and preserve the carcasses for consumption pursuant to WGFC regulations and my Brown Card.

37.     I told the group that I was going to leave to search for and potentially dispatch the wounded elk. I asked Cumani, Shehu, and Schnell to stay in the area while I investigated. Viles asked if the hunters needed to stay at the present location. I said they did not. Shehu did not say anything. I asked them to stay because I anticipated that I would interview Cumani, Shehu, and Schnell and seize their guns if I located any wounded elk and found any bullets. Cumani and Schnell agreed to do so. While the guns were potential evidence of a crime, I did not seize them at the green gate as a matter of courtesy and consideration to the hunters.

38.     I never ordered Cumani, Shehu, or Schnell, to go to any location, to go to Richmond's house, to not leave the county, or to not leave the state. Cumani, Shehu, and Schnell were free to leave any time they wanted.

39.     At approximately 11:00 or 11:30 a.m., I left with Tyler Viles so he could show me the exact shooting location. The trip up and back took about 30 to 45 minutes. During this trip we stopped briefly on the way up and way back to talk to a hunter name Kade Fitzgerald and his grandfather. I checked Kade's license and ask him if he had shot at any elk. He told me he had not shot any elk. Kade's Grandfather was not hunting.

40.     Upon returning to the green gate I left immediately to meet with Brian Peters. I met with Brian Peters at The Nature Conservancy to look for the wounded elk at about 12:30 or 1:00 p.m.

41.     Peters observed a wounded cow elk, referred to in my report as elk #6. Elk #6 had separated from the main herd, which continued south and over the top of a ridge. This behavior indicated to me that this elk was seriously injured. In my experience, a healthy elk would have

stayed with the herd. I found the cow elk bedded down. It did not get up when I approached to within fifty yards. Based on my experience as a game warden, a healthy elk, especially from a herd hunted this heavily, would have immediately gotten up and run away. Based on these observations I concluded that the elk was wounded, could no longer stand or travel, and would likely die. At this point I dispatched elk #6 pursuant to my legal authority reflected in my Brown Card.

42.     After dispatching elk #6 I went up to it and examined it. Elk #6 had a compound fracture to its right front leg above the knee joint. When able to physically examine the wound, I determined that the veins and arteries had not stopped bleeding, and the wound was not dried out. If the animal is still alive and the wound is older than a couple of hours, it will stop bleeding. If you do not see fresh drippings of blood the blood is coagulating. Over time, tissue will dry up and become dirty and shriveled back. My observations indicated to me that the elk had been wounded within the last few hours. The bone was fragmented in a spider web pattern. A portion of the leg was only attached by skin and tendons. The aggressive spider web pattern of the fracture was consistent with a bullet exploding and fragmenting. Based on my experience, a blunt force fracture does not lead to the extreme fragmentation I observed. I concluded that the wound to elk #6 was a fresh bullet wound.

43.     After finding elk #6, I proceeded to the top of a ridge to look for the wounded bull elk Peters had observed earlier, referred to in my report as elk #7. I eventually located a blood trail on the snow. Tracks and blood in the snow suggested the elk had tried to jump a high tensile wire fence and may have become entangled, which indicated he was not healthy enough to properly jump over the fence. The tracks of this elk separated from the main herd, which continued south and over the top of the ridge. This behavior indicated to me that this elk was seriously injured.  In my experience, a healthy elk would have stayed with the herd. I continued to follow the blood trail

and found the elk bedded with his head lying flat on the ground, a behavior consistent with a wounded animal that is unable to flee. With binoculars, I observed a significant amount of blood on the snow around the elk. Based on this observation, I concluded that the elk was wounded and would likely die. At this point I dispatched elk #7 pursuant to my legal authority reflected in my Brown Card.

44.     After dispatching elk #7 I went up to it and examined it. Elk #7 had a compound fracture to its left front leg at the joint above the hoof. When able to physically examine the wound, I determined that the veins and arteries had not stopped bleeding, and the wound was not dried out. If the animal is still alive and the wound is older than a couple of hours, it will stop bleeding. If you don't see fresh drippings of blood the blood is coagulating. Over time, tissue will dry up and become dirty and shriveled back. My observations indicated to me that the elk had been wounded within the last few hours. The bone was fragmented in a spider web pattern. The aggressive spider web pattern of the fracture was consistent with a bullet exploding and fragmenting. Based on my experience, a blunt force fracture does not lead to the extreme fragmentation I observed. I concluded that the wound to elk #7 was a fresh bullet wound.

45.     After dispatching elk #6 and #7, I first field dressed them by removing the vital organs. I also used a metal detector to search for bullets in both elk and was unable to find any. Brian Peters and I then loaded them in my truck and left for Brett Richmond's house at approximately 4:30 p.m. on October 27, 2019.

46.     From the time I arrived at the green gate on the morning of October 27, 2019, to the time I left at 4:30 p.m. I did not hear any gunshots. With the exception of driving to meet Peters I was never farther than a few miles from the shooting location.

47.     It took about forty minutes to get to Brett Richmond's house from where I loaded

the elk into my truck on The Nature Conservancy. I arrived at his house around 5:00 p.m. on

October 27, 2019. Cumani and Shehu did not exit Richmond's house until around 6:00 on October

27, 2019. I briefly talked to Cumani and Shehu before they left Richmond's house. I issued Schnell

a citation for a wrong-sex violation and issued him a donation coupon for the elk that he shot. I

donated Schnell's bull back to him. I did not tell Cumani, Shehu or Schnell at any time that they

had not shot those elk or words to that effect.

48.    I did not seize any guns as evidence because, while I had found what appeared to

be bullet wounds in elk #6 and elk #7, I had not found any bullets.

49.    I went to the Game and Fish Building in Cody, Wyoming on October 28, 2019 and

photographed elk #6 and elk #7. The photographs submitted herewith as Exhibits "E", "F", and

"G", accurately depict elk #6 at that time. The photograph submitted herewith as Exhibit "H"

depicts elk #7 at the location it was dispatched. The photographs submitted herewith as Exhibits

"I" and "J" accurately depict elk #7 as it appeared at the Game and Fish Building.

50.    I continued my investigation on October 28, 2019. I went to the location identified

by Viles as the shooting location. I followed a vehicle track toward the location where Viles had

told me that the harvested elk had been killed. I found the location of three elk carcasses, I labeled

these carcasses elk #3, elk #4, and elk #5. Elk #3 and elk #4 were both cows. Elk #5 was a headless

elk. I determined that elk #5 was the bull elk that Schnell had shot and I had directed Viles to take

the head from.

51.    I found three depressions in the snow at the shooting location identified by Viles. I

found two casings from a .30-06 at the furthest right shooting position, six head-stamped Lapua

6.5-284 casings at the furthest left shooting position, six head-stamped Hornady 6.5-284 casings

and five head stamped Lapua 6.5-284 casings at the middle shooting position. I recovered a total

of 19 rifle casings from the three shooting positions.  The 6.5-284 casings coincided with the 6.5-284 rifles Cumani and Shehu had showed me. The .30-06 casings coincided with the .30-06 rifle Schnell had showed me.

52.    The shell casings I located on October 28, 2019 were not tarnished. The shell casings were located to the right and rear of the impressions created by the shooters. This was consistent with how casings would eject from a right handed bolt action rifle. They were located in three groupings consistent with three shooters. The brass in each grouping was also the same caliber. Some of the brass was laying on top of the snow that had fallen the night of October 26, 2019 and the early morning of October 27, 2019. Many brass from the same head-stamp and caliber were located in the area where the brass should have been if the shooters were laying prone and shooting.  This indicated to me that the brass were from the same shooters.

53.    I took a video of the shooting location on October 28, 2019. The video clip is submitted herewith as Exhibit "K".

54.    When I investigated the scene on October 28, 2019, I found a boot track, which I referred to as a man track, which led to a bloody elk track. I followed the bloody elk track back into the main elk trail.

55.    On October 28, 2019, I photographed the man track leading to the bloody elk track. I followed this bloody elk track about 3/8 of a mile to where it rejoined the main elk herd. I believed this elk track was from either elk #6 or elk #7, which I had found on October 27, 2019.

56.    The photographs submitted herewith as Exhibits "L" and "M" accurately depict the man track leading to the bloody elk track, which I observed on October 28, 2019.

57.    I located another elk carcass on October 28, 2019, which I designated elk #2. Elk #2 was laying left side down, right side up with a pretty sizeable hole in its flank.

58.     I located an elk carcass on October 28, 2019, which I designated elk #1. Elk #1 was laying on its right side and its left eye was missing from the carcass. I found elk #1 after I found elk #2. I conducted a necropsy on elk #1 and extracted bullet fragments. I took several photographs of elk #1.

59.     The photographs, submitted herewith as Exhibits "N" and "O" accurately depict elk #1 as I observed it on October 28, 2019.

60.     When I first saw elk #1 and elk #2 they were bloated. Gasses in the rumen, or stomach, had not gone out. Base on my training and experience, bloating takes some time, and in cold conditions, takes longer. The outside of the carcasses were cold but the meat was warm to the touch. There was no snow on carcasses. Bare dirt and vegetation was exposed from the underside of the carcass when the elk were rolled over. No hoarfrost was on the carcasses, meaning they had been warm enough that night for the frost to have melted. All these observations indicated to me that the elk had been killed the previous day after the snow fell but had been warm enough that night to melt the frost as the elk cooled. The meat was pink and smelled foul, indicating that it was spoiled. The spoilage was consistent with the elk having been there for around twenty-four hours. There was a noticeable difference between the temperature of the exterior of the elk and the tissue or deep internal organs. I could feel warmth in the heart. All these observations indicated that elk #1 and elk #2 had been killed the previous day.

61.     When I conducted the investigation at the scene of the incident on October 28, 2019, I observed the tracks left by the main herd of elk. At the locations where I found elk #1 and elk #2, the tracks were going several different directions. This indicated to me that the elk had milled around at this location when they were originally shot at. I ranged the distance from elk #1 to my truck at 403 yards. My truck was within 30 feet of the shooting location. This was consistent

with Tyler Viles's statement to me on October 27, 2019 that Tyler had waited until the elk were within 400 yards to tell the hunters to start shooting. Elk may often mill about when they are shot at, trying to find the location from which the shots are coming.

62. During my investigation, I contacted every individual I was aware of who hunted in that area of Heart Mountain on October 27, 2019. The only individuals who reported having shot at elk were Cumani, Shehu, and Schnell.

63. I subsequently prepared an Investigative Report, a true and correct copy of which is submitted herewith as Exhibit "P".

64. On approximately December 2, 2019, I submitted my Investigative Report to the Park County Attorney for him to determine whether to issue any charges in connection with the incidents of October 27, 2019.

65. At the request of the Park County Attorney's Office, I went to the Park County Attorney's office on January 16, 2020. When I arrived at the office, a legal assistant had typed up an Affidavit of Probable Cause. I reviewed and executed the Affidavit of Probable Cause, a true and correct copy of which is submitted herewith as Exhibit "Q".

66. The Park County Attorney's Office determined whether to file charges in this matter, what charges would be filed and against whom (if anyone) charges would be filed.

DATED this 6th day of March, 2024.

_____
Chris Queen

STATE OF Wyoming )
                          ) ss.
COUNTY OF Park )

    The foregoing Affidavit of Chris Queen was subscribed and sworn to before me by Chris Queen this 6th day of March, 2024.

Witness my hand and official seal

KATIE STROMBERGER   NOTARY PUBLIC
STATE OF WYOMING
COMMISSION ID# 166530
MY COMMISSION EXPIRES:   JANUARY 27, 2028

_____
Notary Public

My commission expires: January 27, 2028