Bradley L. Booke   #5-1676
LAW OFFICE OF BRADLEY L. BOOKE
P.O. Box 13160
Jackson, Wyoming 83002
702-241-1641
866-297-4863 Fax
brad.booke@lawbooke.com
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **BLENDI CUMANI, M.D. and** | ) | |
| **ROLAND SHEHU,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | Case No. 23-CV-55-ABJ |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHRIS QUEEN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NOS. 33-35)

The dispositive flaws in Defendant's motion are made obvious by its "Preliminary Statement" (ECF No. 34, at 1-2), which admits that Defendant Queen thought that "the Viles group," *not Dr. Cumani or Mr. Shehu personally,* committed over-limit and wrong-sex violations. Such vagary was neither a particularized nor an objective basis for a "reasonable suspicion" that Dr. Cumani or Mr. Shehu had committed an over-limit or wrong-sex violation. Defendant Queen had no facts, within his personal knowledge or supported by reasonably trustworthy information, that would have led a prudent person to believe there was "probable cause" that Dr. Cumani or Mr. Shehu had committed these offenses. Moreover, Dr. Cumani or Mr. Shehu were never charged

with over-limit or wrong-sex crimes—they were prosecuted for abandoning and wasting elk—an entirely different crime, which was also unsupported by the information Defendant Queen had.

These facts explain why it is uncontroverted that a Park County jury acquitted Dr. Cumani, Mr. Shehu, and their guide, Mr. Viles, after a four-day trial. They should never have been detained, charged, or prosecuted in the first place, and doing so violated their clearly-established constitutional rights to be free from wrongful detention and wrongful prosecution. Defendant Queen has no immunity for such violations.

## I.    SUMMARY

On the early morning of October 27, 2019, Dr. Blendi Cumani, Mr. Roland Shehu, and George Schnell were taken on an elk hunt by Tyler Viles, a hunting guide for Brett Richmond's outfitting service. Defendant's motion refers to these four people as "the Viles group." The four went to hunt on the Two Dot Ranch on Heart Mountain near Cody.

As explained below, the record in this case demonstrates—at a very minimum—that Defendant Queen *never* had reasonable suspicion, reasonably trustworthy information, or probable cause to believe that Dr. Cumani or Mr. Shehu shot, wounded, or killed the elk for which he caused them to be prosecuted. Significantly, the record shows that Defendant Queen never determined or specified, much less proved, which of Dr. Cumani or Mr. Shehu shot or wounded or killed which of the elk Defendant Queen made the subject of the criminal prosecution.

The events at issue began when outfitter Brett Richmond called Defendant Game Warden Queen to voluntarily self-report that George Schnell had shot a bull elk while possessing a cow elk tag. The bull had stepped in front of the cow as Mr. Schnell fired, wounding the bull. The shot was not fatal, so Mr. Richmond's guide, Tyler Viles, instructed Mr. Schnell to shoot again and kill the bull. Schnell did so.

Mr. Viles immediately called Mr. Richmond and reported what had happened.   Mr. Richmond immediately called Defendant Queen, who was then 2½ hours away in Sunlight Basin, Wyoming.   Although both Viles and Richmond did exactly what the law required them to do, Defendant Queen reacted with outrage—not the reasonable demeanor required of law enforcement officers.   He screamed at Mr. Richmond on the phone about *prior and unrelated hunting events* that had nothing to do with what Mr. Richmond had just reported.   His outrage grew and was repeatedly expressed throughout the day.

As Defendant Queen drove from Sunlight Basin to the Two Dot Ranch, he spoke by phone to his friends, Brian Peters and Heath Worstell, who were in the Heart Mountain area. Significantly, neither Mr. Peters nor Mr. Worstell, who were Defendant Queen's primary sources of information, had seen either or Dr. Cumani or Mr. Shehu shoot at or wound any elk.   Defendant Queen knew that when he arrived at the Heart Mountain area.

Defendant Queen was aggressive and combative when he talked to Tyler Viles at the scene. He (Queen) was angry and raised his voice to Mr. Viles, claiming that there had been several *prior* wrong-sex violations and that he (Queen) was going to start taking hunters' vehicles and guns and everything they used if it continued.   Mr. Viles explained that he had never been involved in any such violations.   Mr. Viles then walked Defendant Queen through the area where the party had hunted and the events of their hunt, and Defendant Queen remained angry and continued to refer to *prior* hunting events that Queen claimed had occurred.

Defendant Queen then met with "the Viles group."   Dr. Cumani, who is a hand surgeon in Minot, North Dakota, told Defendant Queen that he had surgeries scheduled for the next morning and needed to make the nine-hour drive back to North Dakota.   Mr. Shehu, who operates a home health care service in Philadelphia, had driven to Cody with Dr. Cumani and needed to leave with

him.  After being so informed, Defendant Queen ordered Dr. Cumani and Mr. Shehu not to leave, and to go Brett Richmond's home and stay there until they heard further from him.  Defendant Queen repeated this order several times in the presence of several people.  The record shows that—having been born into and grown up under Communist rule in Albania, and having been given a direct order by a law enforcement officer—Dr. Cumani and Mr. Shehu did exactly as they were ordered to do.

In the late afternoon or early evening of October 27, 2019, Defendant Queen drove his truck to Mr. Richmond's house carrying the elk that he claimed were illegally shot by "the Viles group."  Defendant Queen was still agitated and argumentative when he spoke with Mr. Richmond.  Mr. Richmond asked to look at the elk in the bed of Defendant Queen's to examine the wounds that Defendant Queen claimed were inflicted by "the Viles group."  Mr. Richmond could see one of the elk from the position where he and Defendant Queen were talking and the foreleg wound that Defendant Queen claimed was a gunshot wound appeared to Mr. Richmond to be one that he had seen many times—a "wire cut" which is a scraping, flesh wound caused by a wire fence.  Mr. Richmond asked Defendant Queen to allow him to look at the second elk and Defendant Queen refused.

Defendant Queen then spoke with Dr. Cumani and Mr. Shehu who reiterated that they needed to leave.  Defendant Queen apologized for detaining them, told them they did not shoot the elk, and released them.

Defendant Queen went back to the Heart Mountain area the next day, walked the area, took pictures, and retrieved bullet fragments from (according to Queen) two different elk than those that had been in the bed of his truck at Mr. Richmond's house the previous day.  Significantly, Defendant Queen sent the bullet fragments to the Wyoming Division of Criminal Investigation,

whose ballistics expert concluded that <u>the bullets could not reliably be identified to the guns used by Dr. Cumani and Mr. Shehu.</u>

Thereafter, Defendant Queen prepared a "probable cause affidavit" and Dr. Cumani and Mr. Shehu were charged and prosecuted—not for the wrong-sex and over-limit violations that had been the subject of all of the events of October 27, 2019—but for abandoning and wasting the elk that Defendant Queen claims to have found on October 28, 2019.  Defendant Queen caused the criminal prosecutions to go forward despite the fact that—even to date—Defendant Queen has not determined and cannot say which of Dr. Cumani or Mr. Shehu shot or wounded or killed which of the four elk that were the subjects of the prosecutions.

In sum, the record demonstrates that Defendant Queen had neither reasonable suspicion to detain Dr. Cumani and Mr. Shehu in the first instance, nor probable cause to initiate their prosecutions (nor that of Mr. Viles) for abandoning and wasting game animals in violation of W.S. § 23-3-303(a).  Instead, the record contains evidence which shows that Defendant Queen was predisposed, based on a vindictive and retaliatory motive, to attempt to vicariously punish Mr. Richmond by criminally charging "the Viles group."  But, of course, "the Viles group" could not charged with a crime, so Dr. Cumani, Mr. Shehu, and Mr. Viles were—despite the absence of evidence as to which of them, if any of them, had committed any criminal act.  Defendant Queen never reasonably investigated other hunters who were admittedly in the area at the time, including George Schnell, who had admitted the wrong-sex violation.

Defendant Queen has no immunity, qualified or otherwise, for these actions.  At the time of these events, Dr. Cumani and Mr. Shehu had clearly and long-established constitutional rights under Tenth Circuit law to be free from being detained without reasonable suspicion, and from

being arrested and prosecuted without probable cause.  Here, neither existed.  Defendant Queen's motion should be denied.

## II.      PENDING DISCOVERY MOTION CONSEQUENTIAL FOR THIS MOTION

Defendant's motion tries to deflect Defendant Queen's liability by attributing numerous decisions and actions to the Park County Attorney.  (See ECF No. 34, at pp. 3, 8, 21, 31)

Anticipating this attempt, on January 8, 2024, Plaintiffs served a subpoena *duces tecum* to the Park County Attorney for its file.  (ECF No. 25).  The Park County Attorney moved to quash the subpoena (ECF No. 27) and has produced nothing.  Plaintiffs responded to Park County's motion.  (ECF No. 28).  Park County replied (ECF No. 29).  The motion is pending.

## III.     FACTS IN THE RECORD

1.      Tyler Viles was a hunting guide for licensed outfitter Brett Richmond and was guiding Dr. Cumani, Mr. Shehu, and Mr. George Schnell on October 27, 2019.  (Exhibit 1, Viles deposition transcript, at 9:2-7; 38:1-5)

2.      On the hunt, Mr. Schnell shot a bull elk on a cow elk tag when the bull stepped in front of a cow elk as Mr. Schnell fired.  The shot did not kill the bull, so Mr. Viles properly instructed Mr. Schnell to shoot again and kill the bull, and Mr. Schnell did so.  (Exhibit 2, Queen transcript of telephone interview with Schnell, at CUMANI-SHEHU 0044)

3.      Mr. Viles stopped the hunt as soon as Mr. Schell shot the bull.  (Exhibit 1, Viles deposition transcript, at 48:25-49:11)

4.      Within a minute of when Mr. Schnell shot the bull, Mr. Viles called Mr. Richmond and reported it.  (Exhibit 1, at 50:23-51:15; Exhibit 3; Richmond deposition transcript, at 36:14-37:1)

5.      At 8:03 a.m., Mr. Richmond called Defendant Queen and reported that Mr. Schnell had shot a bull elk on a cow tag.  (Exhibit 3, Richmond deposition transcript, at 36:14-37:12; 39:1-10; 44:13-19)

6.      Mr. Richmond and Mr. Viles took the legally-proper action in reporting the killing of the bull elk to Defendant Queen.  (Exhibit 8, at 129:13-132:14)

7.      When Mr. Richmond reported that Mr. Schell had shot a bull, Defendant Queen was heated, screaming, and went nuts on the phone.  (Exhibit 3, at 44:20-45:4; 46:3-7; 70:13-15)

8.      Defendant Queen told Mr. Richmond that he (Queen) had just gotten off the phone with Brian Peters, that Mr. Peters told him (Queen) that Richmond's hunters had "wounded a whole bunch of elk," and that "somebody was gonna have to pay for it" (Exhibit 3, at 69:8-70:1; 71:18-72:8), but Defendant Queen testified that Mr. Peters did not tell him that he (Peters) saw either Dr. Cumani or Mr. Shehu shoot any elk.  (Exhibit 8, Queen deposition transcript, at 119:24-120:6)

   A.   Mr. Peters was two miles away from where the Viles group was hunting.  (Exhibit 8, at 155:24-157:14)

   B.   Mr. Peters does not get along with Mr. Richmond or the people in his outfitting service.  (Exhibit 8, at 162:15-163:12)

   C.   Mr. Peters does not remember telling Defendant Queen that Dr. Cumani or Mr. Shehu shoot or wound a bull elk or cow elk (Exhibit 4, Peters deposition transcript at 9:13-11:4); he admits that he did not see Dr. Cumani or Mr. Shehu shoot at or wound a bull elk or cow elk (Exhibit 4, at 6:23-7:13; 8:2-13: 12:18-13:11); and he has never believed that Dr. Cumani or Mr. Shehu wounded or abandoned a bull elk or cow elk that day.  (Exhibit 4, 19:23-20:23)

D.     Mr. Peters told Defendant Queen that Heath Worstell was in the area where the Viles group was hunting.  (Exhibit 8, at 191:25-192:2).  Mr. Peters told Defendant Queen that he could not see any hunters, but that Heath Worstell was in the area because he saw Mr. Worstell's truck.  (Exhibit 8, at 158:8-24)

E.     While Defendant Queen was enroute from Sunlight Basin to the corrals, he called Heath Worstell, who Mr. Peters had said was in the Heart Mountain area.  (Exhibit 8, Queen deposition transcript, at 120:9-122:4: 144:16-21; 146:1-5)

F.     When Defendant Queen spoke to Mr. Worstell, Mr. Worstell was a mile away from where the Viles group was hunting and had no line of sight to the Viles group's location.  Exhibit 8, at 123:5-14).

G.     Mr. Worstell admits that he did not see Dr. Cumani or Mr. Shehu shoot or wound any elk (Exhibit 5, Worstell deposition transcript, at 28:3-11; 29:5-22) and he did not tell Defendant Queen that Dr. Cumani or Mr. Shehu that he saw Dr. Cumani or Mr. Shehu shoot or wound any elk (Exhibit 5, at 32:2-15; 32:23-33:7; 36:19-37:9; 45:11-46:4).

H.     Mr. Worstell has considered Defendant Queen to be a friend for six or seven years (Exhibit 5, at 16:8-14) since they have coached together on their sons' baseball team, (Exhibit 5, at 16:12-4), while socializing and as a guest in Defendant Queen's house (Exhibit 5, at 16:15-17:20), but Defendant Queen does not consider Mr. Worstell to be a friend.  (Exhibit 8, at 121:16-122:6; 122:17-18)

9.     Mr. Richmond waited until Defendant Queen calmed down then asked Defendant Queen what should be done with the bull elk.  (Exhibit 3, at 45:2-19; 46:8-23; 70:7-12)

10.     Defendant Queen told Mr. Richmond to have Mr. Viles cut up the bull elk, then meet him at a location called the "corrals" (Id.) once he (Queen) drove from the 2-2½ hours from Sunlight Basin.  (Exhibit 8, at 120:23-121:15)

11.     Mr. Richmond then called Mr. Viles, told him to set up a spotting scope, and that he (Richmond) would come to the hunting area so they could watch Defendant Queen when he arrived.  (Exhibit 3, at 65:4-12)

12.     Shortly after Mr. Richmond and Mr. Viles spoke, Mr. Viles called Defendant Queen to explain what happened.  Defendant Queen was upset, raised his voice, was very animated, and yelled at Mr. Viles, stating that this was the third bull killed on a cow tag that fall. (Exhibit 1, at 52:8-53:8)

13.     Mr. Richmond drove to the corrals and, at about 9:00 a.m., talked again to Defendant Queen, this time from Mr. Viles' phone.  (Exhibit 3, at 73:20-22; 47:6-49:8)

14.     Defendant Queen was "pretty wound up" during the 9:00 call and told Mr. Richmond that he was going to detain Dr. Cumani, Mr. Shehu, and Mr. Schnell; and that they should stay at the corrals or go to Mr. Richmond's house.  (Exhibit 3, at 48:5-49:8; 40:12-25; 41:13-18)

15.     When Defendant Queen arrived at the corrals, he (Queen) was very angry, very combative, and very aggressive about prior situations in which hunters with cow tags had shot bulls.  Mr. Viles explained that he had not been party to any prior violations.  (Exhibit 1, at 55:4-58:13)

16.     When Defendant Queen spoke to Dr. Cumani and Mr. Shehu at the corrals, Defendant Queen was very agitated, irritated, demanding, animated, very angry, and upset; Defendant Queen told them  that the "conservancy guy" told him (Queen) that "you guys wounded

the elk." (Exhibit 6, Deposition transcript of Blendi Cumani, M.D., at 42:18-45:4; Exhibit 7, Deposition transcript of Roland Shehu, at 56:9-57:22).

17.     Dr. Cumani told Defendant Queen that he (Dr. Cumani) was leaving and going to North Dakota, and Defendant Queen said, "No, you're not.  You're going to Richmond's house. You're not to leave Richmond's house." (Exhibit 6, at 45:24-46:10; Exhibit 7, at 57:15-22; Exhibit 1, at 60:2-61:13)

18.     Dr. Cumani and Mr. Shehu did as they were told because a law enforcement official told them they were not to leave (Exhibit 1, at 62:18-21)  because, in Mr. Shehu's words, having grown up in Albania, a communist country (Exhibit 6, at 5:2-19; Exhibit 7, at 8:15-24):

> Well, I come from a communist country.  I was born and raised until the age of 17, and we were oppressed.  My family was oppressed. And I felt the same way when Queen told me not to move, obey him and stay to Richmond's house. So it brought back my childhood memories when my uncle was taken to jail because he opposed the communism, when my father wasn't allowed to see him and not a thing happened to my family. Those memories, you know, it's not easy to go away. I just need a trigger to remember those.  And it's -- it's a scar you cannot take it away.

(Exhibit 7, at 92:25-93:9)

19.     In the early evening of October 27, Defendant Queen went to Mr. Richmond's house (Exhibit 8, at 8:10-9:22), started trying to poke Mr. Richmond in the chest, and told Richmond that he had better get a lawyer and a good one because he will need it.  (Exhibit 3, at 60:15-19; Exhibit 1, at 81:12-82:8)

20.     At that time, Defendant Queen had dead elk in the back of his truck (Exhibit 1, at 83:21-84:6), including one bull and one cow (Exhibit 8, at 54:19-55:3).  Mr. Richmond looked at the wounds on one of the elk that Defendant Queen said the Viles group had shot and recognized the scraping as a wire cut of the type that occurs from fences; Defendant Queen would not allow

Mr. Richmond to look at the wound on a second elk.  (Exhibit 3, at 41: 1-7; 54:12-55:13; Exhibit 1, at 83:21-84:24)

21.    At about 7:00-7:30 p.m., after Defendant Queen had spoken to Mr. Richmond, Defendant Queen told Dr. Cumani that "everything was okay and he (Queen) was sorry to have held them up" and they could leave.  (Exhibit 6, at  55:3-56:17; Exhibit 7, at 60:22-25).

22.    Defendant Queen told Mr. Shehu, "Yes, I'm sorry to have detained you here. You're free to go.  You did not shoot these elk."  (Exhibit 7, Deposition transcript of Mr. Shehu, at 78:10-25)

23.    On October 28, 2019, Defendant Queen went to the Heart Mountain area, took photos, and collected physical evidence, including bullet fragments from a dead elk (See, generally, ECF No. 35-16), which he (Queen) says was not the elk that was in the back of his truck on October 27 at Mr. Richmond's house, which he had told Mr. Richmond was one of the elk that Dr. Cumani and Mr. Shehu had wounded.  (Exhibit 3, at 54:12-55:15; Exhibit 8, at 136:19-137:4)

24.    Defendant Queen sent the bullet fragments to the State of Wyoming Division of Criminal Investigation, where ballistics expert, Special Agent Darrell Steward, examined the bullets, read related ballistics literature, and concluded that the evidence was "not enough [] to make a confident identification of the bullet fragment recovered from the elk" to the guns used by Dr. Cumani and Mr. Shehu.  (Exhibit 9, Report of Wyoming Division of Criminal Investigation, CUMANI-SHEHU 0112-0113, at 0113)

25.    The only effort Defendant Queen made to investigate whether there were other hunters within a one-mile radius of the events described above was to interview Heath Worstell and Brian Peters (Exhibit 8, at 118:14-21) and Defendant Queen only spoke to Mr. Worstell on the phone while he (Queen) was driving from Sunlight Basin.  (Exhibit 8, at 120:9-24)

26.     Heath Worstell's spouse and son had cow elk tags for the hunting area where the foregoing events occurred (Exhibit 5, at 47:23-48:4) but Defendant Queen never inspected their guns.  (Exhibit 8, at 159:2-160:8)

27.     Kade Fitzgerald was also hunting in the area.  Defendant Queen spoke to him on the phone and asked him if he had shot his gun.  Mr. Fitzgerald said no and Defendant Queen took that at face value.  (Exhibit 8, at 124:7-8; 192:3-23)

28.     Defendant Queen is now unsure whether Dr. Cumani and Mr. Shehu were charged with waste and abandonment of the elk that were in the back of his truck when he went to Mr. Richmond's house on October 27, 2019.  (Exhibit 8, at 75:7-20)

29.     Defendant Queen does not know which of Dr. Cumani or Mr. Shehu shot which of the elk that both were charged with having abandoned and wasted, or whether either of the elk was within the herd that "the Viles group" was hunting.  (Exhibit 8, at 85:6-86:6)

30.     Defendant Queen has no physical evidence, no eyewitness evidence, and no hearsay evidence that Mr. Shehu shot either of the elk that he (Queen) found on October 28, and no eyewitness evidence or hearsay evidence that Dr. Cumani shot either of the elk that he (Queen) found on October 28, with the only physical evidence being the bullet fragment that the Division of Criminal Investigation could not identify to either Dr. Cumani's or Mr. Shehu's guns.  (Exhibit 8, at 87:14-89:8; 86:7-87:10)

31.     Despite the exculpatory ballistics evidence, the lack of eyewitness evidence, the lack of hearsay evidence, the lack of investigation of other hunters, and the specific representations of Defendant Queen to both Dr. Cumani and Mr. Shehu on the early evening of October 27, 2019, in January 2020, Defendant Queen executed an Affidavit of Probable Cause and caused Dr. Cumani and Mr. Shehu to be prosecuted.  (ECF No. 35-17)

32.    In January of February 2020, Defendant Queen called Dr. Cumani and Mr. Shehu and told them he was going to serving criminal citations to them.  (Exhibit 6, at 58:1-22; Exhibit 7, at 83:3-84:20)

## IV.    RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1-4.    Not disputed.  The facts prove one element under 42 U.S.C. § 1983—that Defendant Queen was acting under color of law at the time of the events alleged in this action.

5-6.    These are statements of Wyoming law.  The statutes speak for themselves.

7.    Not disputed.  This is a further fact that proves the "color of law" element of 42 U.S.C. § 1983.

8.    Not disputed that Mr. Richmond is a licensed outfitter with permission to hunt on the Two Dot Ranch and that Tyler Viles was a guide for Mr. Richmond at the time of the events alleged.  The statement that Mr. Richmond's hunting parties are known as the "Two Dot Guys" is hearsay, lacks foundation, and is irrelevant.

9.    Not disputed.

10.    Disputed.  These statements are hearsay, lack foundation, and are contrary to the testimony of Tyler Viles cited in Fact #15 above.

11.    Not disputed that Brian Peters was the manager of The Nature Conservancy Ranch at the time of the events alleged in the complaint and had contact with Defendant Queen.  Mr. Peters had animosity toward Mr. Richmond and his outfitting company as set forth in Fact #8(b) above.

12.    Undisputed.

13.    Not disputed, but incomplete.  See Fact #s 7-10 above.

14.    Not disputed, but incomplete.  See Fact #s 8(A)-(E) above.

15.     Disputed.  Inadmissible hearsay.  Mr. Peters had no line of sight to the Viles group.  See Fact #8(A), 8(D) above.

16.     Disputed.  Lacks foundation.  Inadmissible hearsay.  Unsupported in record and irrelevant.

17.     Not disputed.

18.     Not disputed, but incomplete.  See Fact #12 above.

19.     Disputed.  Lacks foundation.  Incomplete and omits that Defendant Queen was angry, combative, aggressive, screaming, and agitated about the prior events referenced in ECF No. 34 at ¶ 10 and Fact #s 7-8, 12-16 above, for which he and Mr. Peters wrongfully blamed Mr. Richmond.

20.     Not disputed that Defendant Queen prepared a report.  Inadmissible hearsay as to any statements or requests made by the Park County Attorney, who has refused to produce any documents in response to subpoena.  See Section II above re: Pending Discovery Motion.

21.     Disputed.  See Fact #s 14, 16, 18, 21, 22 and Complaint.

22.     Disputed.  Lacks foundation.  Inadmissible hearsay.

23.     Disputed.  Unsupported in record.

24.     Disputed.  Inadmissible hearsay.  Mr. Worstell had no line of sight to the Viles group.  Fact #8(F).  Mr. Worstell testified that he did not see Dr. Cumani or Mr. Shehu shooting and that he could not identify anyone in the group.  See Fact #s 8(G)-(H).

25.     Disputed.  Inadmissible hearsay.  Unsupported in record.  Contrary to Fact #8(G).

26.     Disputed.  Inadmissible hearsay.  Lacks foundation.  Unsupported in record and irrelevant as to Defendant Queen's subjective belief.

27.     Disputed.  Inadmissible hearsay.  Lacks foundation.

28.     Not disputed as to hunting licenses observed.  Disputed, inadmissible hearsay as to Mr. Schnell.

29.     Not disputed as to numbers recorded.  Disputed as to Defendant Queen's subjective state of mind.

30.     Disputed.  Contains numerous inadmissible hearsay statements and is argument, not evidence in record as required under Rule 56.

31.     Disputed.  Irrelevant as to Defendant Queen's subjective state of mind based on inadmissible hearsay by Peters.

32.     Disputed.  Inadmissible hearsay.  Contrary to Fact #s7, 10, 12, 14-18.

33.     Not disputed that Dr. Cumani and Mr. Shehu were ordered to go to Mr. Richmond's house and not leave.  Irrelevant as to Defendant Queen's subjective state of mind and to seizing evidence.  Undisputed that Defendant Queen did not draw weapon or use handcuffs.

34.     Undisputed as to visit to hunting area.  Disputed as to hearsay statements by Fitzgerald.

35.     Disputed.  Contrary to Fact #s 16-17.

36.     Undisputed as to meeting Mr. Peters.  Disputed and irrelevant as to Defendant Queen's subjective state of mind.

37.     Disputed.  Lacks foundation as to observation by third person, Mr. Peters.

38.     Disputed.  Lacks foundation as to unobserved route of travel by elk.

39.     Undisputed as to observations of cow elk.  Lacks foundation as to physical condition of elk, elk thought processes, elk behavior.

40.     Undisputed that Defendant Queen killed cow elk.  Disputed as to Defendant Queen's subjective state of mind for doing so.

41.     Undisputed that Defendant Queen looked at elk.  Disputed for lack of veterinary pathology foundation as to description and cause of injuries and Defendant Queen's subjective opinions.

42.     Disputed as to Defendant Queen's subjective state of mind.  Undisputed that Defendant Queen killed bull elk.  Undisputed that Mr. Richmond testified under oath that he observed Defendant Queen shoot and kill the bull elk and the bull elk was uninjured when Defendant Queen shot the elk.

43.     Undisputed that Defendant Queen testified that he did not find bullets in the bull elk that he killed.

44.     Undisputed but irrelevant.

45.     Undisputed.

46.     Undisputed but irrelevant.

47.     Undisputed that Defendant Queen arrived at Mr. Richmond's house with elk in bed of his truck.

48.     Undisputed but incomplete.  See Fact #s 19-20.

49.     Undisputed that Defendant Queen spoke to Dr. Cumani and Mr. Shehu, but incomplete.  See Fact #s 21-22.

50.     Disputed and irrelevant as to Defendant Queen's subjective state of mind.

51.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.

52.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.

53.     Disputed.  Lacks foundation.

54.     Disputed.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind and conclusions.

55.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.

56.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.

57.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

58.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

59.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or

wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

60.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

61.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

62.     Disputed.  Lacks veterinary pathology foundation as to necropsy.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.

63.     Undisputed that Defendant Queen collected bullet fragments.  Incomplete because Wyoming Division of Criminal Investigation concluded that bullet fragments could not be identified to guns being used by Dr. Cumani and Mr. Shehu.

64.     Disputed.  Lacks veterinary pathology foundation as to necropsy.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Speculative and lacks foundation as to scavenging.

65.     Disputed.  Lacks veterinary pathology foundation as to necropsy.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.

66.     Undisputed as to Defendant Queen's conduct observed by no one.   Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

67.     Undisputed as to Defendant Queen's conduct observed by no one.   Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

68.     Undisputed as to Defendant Queen's conduct observed by no one.   Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Undisputed that Defendant Queen collected metal.   Incomplete because Wyoming Division of Criminal Investigation concluded that bullet fragments could not be identified to guns being used by Dr. Cumani and Mr. Shehu.

69.     Undisputed as to Defendant Queen's conduct observed by no one.   Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Undisputed that Defendant Queen collected metal.   Incomplete because Wyoming Division of Criminal Investigation concluded that bullet fragments could not be identified to guns being used by Dr. Cumani and Mr. Shehu.

70.     Undisputed as to Defendant Queen's conduct observed by no one.   Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Undisputed

that Defendant Queen collected metal.  Incomplete because Wyoming Division of Criminal Investigation concluded that bullet fragments could not be identified to guns being used by Dr. Cumani and Mr. Shehu.  Irrelevant as to Defendant Queen's subjective state of mind.

71.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Undisputed that Defendant Queen collected metal.  Incomplete because Wyoming Division of Criminal Investigation concluded that bullet fragments could not be identified to guns being used by Dr. Cumani and Mr. Shehu.

72.     Disputed as incomplete and inadmissible hearsay.  See Exhibit 2.

73.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.

74.     Undisputed as to Defendant Queen's conduct observed by no one.  Irrelevant because Defendant Queen has no evidence as to whether Dr. Cumani or Mr. Shehu shot or wounded either of the elk Defendant Queen reports to have found.  See Fact #s 28-30.  Irrelevant as to Defendant Queen's subjective state of mind.

75.     Disputed.  Defendant Queen's report is dated October 31, 2019 (ECF No. 35-16).  Park County Attorney has refused to provide documents.  See Section II re: pending motion.

76.     Disputed.  Inadmissible hearsay as to request of Park County Attorney.  Lacks foundation as to production of Affidavit of Probable Cause.

77.     Disputed.  Inadmissible hearsay.

**V.     LAW RE: WRONGFUL ARREST, DETENTION AND PROSECUTION**

The Tenth Circuit recognizes § 1983 claims for wrongful arrest and wrongful prosecution. *Wolford v. Lasater*, 78 F.3d 484 (10th Cir. 1996); *Cottrell v. City of Kaysville*, 994 F.2d 730 (10th Cir. 1993); *Anthony v. Baker*, 955 F.2d 1395 (10th Cir. 1992); *Robinson v. Maruffi*, 895 F.2d 649 (10th Cir. 1990).

Wrongful arrest is actionable under 42 U.S.C. § 1983 where a plaintiff shows that he was arrested without probable cause. *Cottrell v. Kaysville City*, 994 F.2d 730, 733 (10th Cir. 1993). Probable cause is determined by an objective standard—whether the facts within the officers' knowledge and of which they have reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed and that the person was involved in the crime. *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017). The court considers "the circumstances as they would have appeared to prudent, cautious and trained police officers." *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999).

Malicious prosecution is actionable under 42 U.S.C. § 1983 where a law enforcement officer's actions cause the plaintiff to be 'seized' without probable cause. *Myers* v. *Koopman*, 738 F. 3d 1190, 1194 (10th Cir. 2013). The elements of malicious prosecution under a § 1983 claim are: (1) the defendant caused the plaintiff's continued confinement <u>or</u> prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, <u>or</u> prosecution; (4) the plaintiff sustained damages. Id. The gravamen of the claim is the wrongful initiation of charges without probable cause. *Thompson v. Clark*, 596 U.S. 36 (2021).

A law enforcement officer does not have qualified immunity in a § 1983 case when an arrest and prosecution violates clearly established constitutional rights. *Mullenix v. Luna*, 577 U.S. 7 (2015). The right to be free from a warrantless detention and arrest without probable cause is a

clearly established Fourth Amendment constitutional right in the Tenth Circuit. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). The right to be free from a wrongful prosecution is a clearly established right in the Tenth Circuit. *Miller v. Spiers*, 339 F. App'x 862, 867 (10th Cir. 2009) (malicious prosecution violates the Fourth *and* Fourteenth Amendment); *See also, Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir.2007) (malicious prosecution claim can be grounded in both the Fourth and Fourteenth Amendments); *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-86 (10th Cir.2004) ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.")).

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, viewing all of the evidence and reasonable inferences in the light most favorable to the nonmoving party. An issue is genuine  if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Sperry v. Maes*, 592 Fed. Appx. 688 (10th Cir. 2014)

There are three types of law enforcement contacts: (1) consensual encounters (2) investigative detentions, which are Fourth Amendment seizures that must be supported by a reasonable suspicion of criminal activity; and (3) arrests that must supported by probable cause." *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018). The distinction between an investigative detention and an arrest is a fact-intensive inquiry based on the length and force of the detention, *Cortez v. McCauley*, 478 1108, 1115 (10th Cir. 2007), and the necessity and length of detention needed to accomplish the purposes of law enforcement. *United States v. Sharpe*, 470 U.S. 675, 685 (1985)

V.      **ANALYSIS**

1.      **There is no Qualified Immunity for Defendant Queen's Wrongful Detention/Arrest.**

As shown above, Tenth Circuit law makes clear that, as of October 27, 2019, Dr. Cumani and Mr. Shehu had clearly-established constitutional rights under at least the Fourth Amendment to be free from wrongful detentions, wrongful arrests, and wrongful prosecutions.   Thus, Defendant Queen has no immunity, qualified or otherwise.

Equally unavailing is Defendant Queen's attempt to split hairs by arguing that he had "reasonable suspicion" to believe that crimes had been committed and that Dr. Cumani and Mr. Shehu were the perpetrators.

As of 9:00 a.m. on October 27, 2019, the only crime of which Defendant Queen had any knowledge was the wrong-sex kill that Mr. Richmond and Mr. Viles had voluntarily reported to him.  It was at that time that Defendant Queen first ordered that Dr. Cumani and Mr. Shehu must go to Mr. Richmond's house and stay there until he (Queen) said otherwise.  And, at that time, Defendant Queen did not have "reasonable suspicion" of anything other than that he was enraged by his unfounded belief that this was the third or fourth time during the 2019 hunting season that Mr. Richmond's hunters had made wrong-sex kills.  Defendant Queen had exhibited that rage to both Mr. Richmond and Mr. Viles by that time—and George Schnell had already admitted that it was he who made the wrong-sex kill.

To compound the *unreasonableness* of his conduct and suspicion, by 10:30 a.m., when Dr. Cumani told Defendant Queen that he was a surgeon and needed to get home to North Dakota-- and Defendant Queen ordered, "No, you're not.  You're going to Richmond's house.  You're not to leave Richmond's house"—Defendant Queen had already inspected the guns that Dr. Cumani and Mr. Shehu had used earlier that morning, and he had written down the make, model, and

relevant information concerning the guns.  So, under the Tenth Circuit's "detain-if-needed-to-accomplish-the-purposes-of-law-enforcement" methodology, Defendant Queen already had all of the information he needed for law enforcement purposes and there was no reason whatsoever to detain Dr. Cumani and Mr. Shehu for another nine (9) hours, *even if* he had reasonable suspicion to believe that a crime had been committed.  But the objective information shows that, when he gave orders directly to Dr. Cumani and Mr. Shehu, Defendant Queen had not seen a single wounded or dead elk other than the ones that the Viles group had lawfully shot—and the only other information he had were the comments of Brian Peters (who Defendant Queen knew to have animus toward Mr. Richmond's hunters) and Heath Worstell, both of whom admittedly had not seen Dr. Cumani or Mr. Shehu shoot at anything that day.

Finally, as of at least 10:30 a.m., Defendant Queen knew very well that, if at any time he wanted to issue criminal citations to Dr. Cumani and Mr. Shehu, he knew exactly where and how to find them—because he had their hunting license information.  Proof positive of that fact is that—in late January or early February, Defendant Queen called both Dr. Cumani and Mr. Shehu and told them he would be serving citations to them.  For that additional reason, there was no reason whatsoever to have detained Dr. Cumani and Mr. Shehu at all, much less for the 9+ hours they were detained.

Dr. Cumani and Mr. Shehu had clearly established constitutional rights not to be detained.  At a bare minimum, the record presents a genuine issue of fact for trial as to whether, at 9:00 a.m., Defendant Queen even had a "reasonable suspicion" that a crime had been committed, much less that Dr. Cumani and/or Mr. Shehu were the perpetrators.  There is no qualified immunity that protects Defendant Queen's detention of these men in this situation and under these circumstances.

**2.    There is no Qualified Immunity for Defendant Queen's Wrongful Prosecution.**

The elements of malicious prosecution under a § 1983 claim in the Tenth Circuit are: (1) the defendant caused the plaintiffs' prosecution; (2) the original action terminated in favor of the plaintiffs; (3) there was no probable cause to support the prosecution (which supplies the "malice" element); and (4) the plaintiffs sustained damages.

Elements 1, 2, and 4 are uncontroverted by Defendant Queen's motion. The probable cause analysis is objective—the question being whether the facts within Defendant Queen's knowledge and of which he had reasonably trustworthy information, were sufficient to warrant a reasonably prudent person of reasonable caution to believe that at least three abandonment and waste crimes had been committed (one each by Dr. Cumani, Mr. Shehu, and Mr. Viles) and that Dr. Cumani and Mr. Shehu committed had the crimes.

Defendant Queen's claim that there is not a genuine issue of fact for trial as to whether there was probable cause for these prosecutions is extraordinary in light of the record cited in Section III above. Evidence in the record—much admitted by Defendant Queen—shows:

- Setting aside the well-documented anger, aggressiveness, combativeness, and agitation that Defendant Queen displayed toward Mr. Richmond's hunting party on multiple occasions October 27, 2019—based on prior events—Defendant Queen's "reasonably trustworthy information" on which he based probable cause was:

  - From Brian Peters, who was two miles away from where the Viles group was hunting,

  - And Mr. Peters admittedly did not see Dr. Cumani or Mr. Shehu shoot at or wound a bull elk or cow elk,

  - Although Defendant Queen knew that Mr. Peters did not get along with Mr. Richmond or the people in his outfitting service.

- Mr. Peters does not remember telling Defendant Queen that Dr. Cumani or Mr. Shehu shoot or wound a bull elk or cow elk,

- And Mr. Peters has never believed that Dr. Cumani or Mr. Shehu wounded or abandoned a bull elk or cow elk that day.

- Heath Worstell was a mile away from where the Viles group was hunting,

- And Mr. Worstell had no line of sight to the Viles group's location.

- Mr. Worstell admits that he did not see Dr. Cumani or Mr. Shehu shoot or wound any elk, and

- Mr. Worstell did not tell Defendant Queen that he saw Dr. Cumani or Mr. Shehu shoot or wound any elk

- Although Defendant Queen took dead elk to Mr. Richmond's house on October 27, 2019 and told Mr. Richmond that the elk in his truck were the elk that Dr. Cumani and Mr. Shehu had shot, he now claims that the elk he found on October 28 were the elk that Dr. Cumani and Mr. Shehu had shot, abandoned, and wasted.

- Defendant Queen had no physical evidence that Mr. Shehu shot either of the elk that he (Queen) found on October 28

- Defendant Queen had no eyewitness evidence that Mr. Shehu shot either of the elk that he (Queen) found on October 28

- Defendant Queen had no hearsay evidence that Mr. Shehu shot either of the elk that he (Queen) found on October 28

- Defendant Queen had no eyewitness evidence that Dr. Cumani shot either of the elk that he (Queen) found on October 28

- Defendant Queen had no hearsay evidence that Dr. Cumani shot either of the elk that he (Queen) found on October 28

- The only physical evidence that that Defendant Queen had to connect Dr. Cumani to the elk he (Queen) claims to have found on October 28 being is the bullet fragment that ballistics experts at the Wyoming Division of Criminal Investigation refused to identify to either Dr. Cumani's or Mr. Shehu's guns.

- Defendant Queen is unsure whether Dr. Cumani and Mr. Shehu were charged with waste and abandonment of the elk that were in the back of his truck when he went to Mr. Richmond's house on October 27, 2019.

- Defendant Queen does not know which of Dr. Cumani or Mr. Shehu shot which of the elk that both were charged with having abandoned and wasted, or whether either of the elk was within the herd that "the Viles group" was hunting.

- At about 7:00-7:30 p.m. on October 27, 2019, after Defendant Queen had spoken to Mr. Richmond, Defendant Queen told Dr. Cumani that "everything was okay and he (Queen) was sorry to have held them up" and they could leave.

- At or about the same time, Defendant Queen told Mr. Shehu, "Yes, I'm sorry to have detained you here. You're free to go. You did not shoot these elk."

Despite the foregoing, Defendant Queen' motion argues that there is not a question of fact as to whether there existed sufficient facts to warrant a reasonably prudent person of reasonable caution to believe that at least three abandonment and waste crimes had been committed (one each by Dr. Cumani, Mr. Shehu, and Mr. Viles) and that Dr. Cumani and Mr. Shehu committed had the crimes. That argument lacks merit. There is an abundant record raising questions for trial as to the existence of probable cause to support the prosecution of Dr. Cumani and Mr. Shehu.

3.      **Detention After Criminal Charges are Filed is not an Element of Wrongful Prosecution.**

Defendant Queen misreads the law in arguing that Dr. Cumani and Mr. Shehu have no claim for wrongful prosecution because they were not arrested after they were charged.   In *Thompson v. Clark*, 596 U.S. 36 (2022), the Supreme Court explained that the gravamen of a Fourth Amendment claim under 42 U.S.C. § 1983   is the wrongful <u>institution</u> of criminal proceedings.  The Court said nothing about the sequence of arrest, charge, and acquittal—only that the proceedings must terminate in favor of the defendant that is charged.

Tenth Circuit law makes this clear, as well.  In *Myers v. Koopman*, 738 F.3d 1190, 1195 (10th Cir. 2013), the Circuit explained that detention without probable cause gives rise to a Fourth Amendment claim for false imprisonment, while institution of legal process without probable cause gives rise to a Fourth Amendment claim for malicious prosecution.

Were Defendant Queen's reading of the law correct, the would be no claim for wrongful prosecution under 42 U.S.C. § 1983 where a criminal defendant is served with a criminal indictment and forced to stand trial without ever having been arrested or otherwise detained or confined.  Such a rule would completely eliminate the possibility that a person wrongfully charged with and exonerated of a white collar crime could ever sue for wrongful prosecution, regardless how malicious was the intention of law enforcement or how false the charges.

## V.      CONCLUSION

The record contains extensive evidence which shows that Defendant Queen detained, charged, and caused the prosecution of Blendi Cumani, M.D. and Roland Shehu out of boiled-over anger at the outfitter they had hired to take them on an elk hunt—not because he had evidence amounting to *reasonable* suspicion or *probable* cause that they had committed any crimes.  A

prompt and complete acquittal by a Park County jury—including an acquittal of their guide, Tyler Viles—puts an exclamation point on that fact. Dr. Cumani and Mr. Shehu had clearly established Fourth Amendment rights to be free from such actions by a game warden operating under the color and authority of the laws of the State of Wyoming—and he has no immunity for such conduct.

There is an ample record of facts for trial on each of the elements of the claims asserted under 42 U.S.C. § 1983. Dr. Cumani and Mr. Shehu respectfully submit that Defendant Queen's motion should be denied and this matter should proceed to a jury trial.[1]

DATED this 1st day of April, 2024.

 /s/ Bradley L. Booke
Bradley L. Booke
250 Veronica Lane, Suite 204
P.O. Box 13160
Jackson, Wyoming 83002
702-241-1631 (Telephone)
866-297-4863 (Facsimile)
brad.booke@lawbooke.com

Attorney for Plaintiffs

---

[1] Plaintiffs also respectfully submit that the motion of the Park County Attorney to quash the subpoena duces tecum served to that office, so that several of the facts asserted in Defendant Queen's motion can be vetted and tested.

CERTIFICATE OF SERVICE

I certify that I served the foregoing pleading this 1st day of April, 2024, to:

Timothy W. Miller, Bar No. 5-2704
Senior Assistant Attorney General
Prentice B. Olive, Bar No. 8-6691
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-5820
(307) 777-3608
(307) 777-8920 Facsimile
tim.miller@wyo.gov
prentice.olive@wyo.gov
Attorneys for Defendant

Bryan A. Skoric, Bar #6-2834
Office of the Park County and Prosecuting Attorney
1002 Sheridan Avenue
Cody, Wyoming 82414

                                                      /s/ Bradley L. Booke