**FILED**



3:42 pm, 10/2/24

**Margaret Botkins**
**Clerk of Court**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

BLENDI CUMANI, M.D., and
ROLAND SHEHU,

Plaintiffs,

v.

CHRIS QUEEN,

Defendant.

Case No.  23-CV-55-ABJ

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 33)

THIS MATTER comes before the Court on Defendants' *Motion for Summary Judgment* (ECF No. 33) and accompanying *Memorandum in Support* (ECF No. 34), filed on March 11, 2024. Plaintiff filed his *Response in Opposition to Defendants' Motion for Summary Judgment* on April 1, 2024. ECF No. 38. Defendants replied on April 8, 2024. ECF No. 41.

Having reviewed the filings, the applicable law, and being otherwise fully advised on the premises, the Court finds and orders that Defendants' *Motion for Summary Judgment* (ECF No. 33) is **GRANTED.**

### FACTUAL BACKGROUND

Defendant Chris Queen was a Senior Game Warden for the Powell District of Wyoming, which includes the northern half of Heart Mountain.[1] ECF No. 34 at 4. As Game Warden, Mr. Queen was tasked with both law enforcement and wildlife management duties, including the enforcement of Wyoming Statute §23-3-402, which makes a violation of a lawful order of the Wyoming Game and Fish Commission a misdemeanor, and §23-3-303(a) which prohibits allowing any game animal to intentionally or needlessly go to waste. ECF No. 34 at 5. Wyoming Game and Fish Commission Regulations prohibit harvesting more animals than the number of licenses in the possession of the hunter and taking a bull elk on a cow/calf permit. *Id.*

Around 8 a.m. on October 27, 2019, the manager of the Nature Conservancy's Heart Mountain Ranch Preserve, Brian Peters, called Mr. Queen to report that he had heard a series of gunshots and had seen two elk, a cow and a bull, fall behind their herd as if wounded.[2] ECF No. 34 at 7; ECF No. 35-3 at 1. Plaintiffs do not dispute that this call occurred and admit that the two talked about hunting elk, but they allege that Mr. Peters' statements are inadmissible hearsay and that because he was two miles away from where the Plaintiffs were hunting and therefore could not have had "a line of sight" on their group. ECF No. 38 at 7, 11, 14.

That same morning, Plaintiffs Dr. Blendi Cumani and Mr. Roland Shehu, along with Mr. George Schnell, were on an elk hunting trip on Heart Mountain, in the Powell District. ECF No. 34 at 6. The group was led by Tyler Viles, a hunting guide for Richmond Ranch

---

[1] Mr. Queen retired in 2022 after 28 years with the Wyoming Game & Fish Department, 17 years of which he spent as Senior Game Warden. ECF No. 34 at 4.

[2] Mr. Peters' statements are not received for their truth, but to set the background for Mr. Queen's investigation.

LLC, an outfitting company owned by Brett Richmond.[3] ECF No. 38 at 6; ECF No. 34 at

5. A little before 8 a.m., Mr. Schnell accidentally shot a bull elk despite only possessing a

cow license. ECF No. 38 at 6. Mr. Viles immediately called Mr. Richmond to report the

incident, and a few minutes later Mr. Richmond called Mr. Queen. *Id.* at 6-7; ECF No. 33

at 7. In his deposition, Mr. Richmond stated that Mr. Queen was angry, and that he told

Mr. Richmond that his hunters "were gonna have to pay for all these wounded elk" even

before Mr. Richmond mentioned the wounded bull elk. ECF No. 38 at 7; ECF 38-3 at 44-

46. Shortly afterwards, Mr. Viles also spoke with Mr. Queen. ECF No. 34 at 8; ECF No.

38 at 14. Mr. Viles confirmed that one of his hunters had killed a bull elk on a cow license

and stated that the group had killed two other cow elk, which he said they were removing

from the field. *Id.* Mr. Queen was upset with Mr. Viles and raised his voice to criticize him.

ECF No. 38 at 9. Mr. Queen asked everyone in the hunting group to meet him at an area

known as "the corrals." *Id.* at 9. He also told Mr. Viles to cut up the elk and asked him to

bring back the head of the bull elk. ECF No. 38 at 9.

At around 9 a.m., while Mr. Queen was en route to meet the Plaintiffs, he called

Heath Worstell, who Mr. Peters had mentioned was also in the area with his family. ECF

No. 38 at 8, 12. Mr. Queen alleges that his goal was to identify whether anyone else in the

area had an elk license and was hunting elk. ECF No. 34 at 9. According to Mr. Queen's

deposition and Mr. Worstell's statement, Mr. Worstell told Mr. Queen that he had not shot

any elk but that he had seen and heard a group of four people shooting at a large group of

---

[3] As Mr. Viles stated in his deposition, in the two weeks prior to October 27th there were two incidents in which Richmond's hunters shot a bull elk without the appropriate tags, though Mr. Viles himself was not involved in either incident. ECF No. 33 at 6.

elk, injuring two of them. ECF No. 34 at 9; ECF No. 35-4 at 1; ECF No. 38-5 at 44-46.
However, Mr. Worstell could not see who was shooting. ECF No. 38 at 8. Mr. Queen
admitted in his deposition that there was not a sightline from the location he believed Mr.
Worstell was calling him from to where the injured elks ended up, which was
approximately a mile away. ECF No. 38 at 17. However, there is no information regarding
whether Mr. Worstell had moved between calling Mr. Queen and seeing the elk, or how
far the elks moved after being injured.

At around 10:30, Mr. Queen went with Mr. Viles to inspect the shooting location,
According to the Plaintiffs, Mr. Queen was very "agitated, irritate, demanding…
angry, and upset" when he arrived at the corrals to meet with the Plaintiffs and the rest of
their hunting party. ECF No. 38 at 9. Mr. Queen and Mr. Viles had an initial conversation
about the hunt. *Id.* According to Mr. Queen, the general hunting location that Mr. Viles
described matched the location that Mr. Peters and Mr. Worstell had described to Mr.
Queen on the phone. ECF No. 34 at 10. Mr. Queen asked to look at each member of the
group's elk licenses. They had four total cow licenses, three of which were "validated,"
indicating that kills had been made. ECF No. 34 at 10; ECF No. 38 at 15.  Mr. Queen also
examined and took down the serial numbers of the group's guns. ECF No. 34 at 10-11;
ECF No. 38 at 9.

At around 10:30, Mr. Queen went with Mr. Viles to inspect the shooting location,
which took 30 to 45 minutes. ECF No. 34 at 12-13; ECF No. 38 at 15. They stopped briefly
to talk to another hunter in the area, and Mr. Queen asked if he had shot anything that day.[4]

---

[4] Plaintiffs dispute the hunter's response as hearsay. ECF No. 38 at 12.

ECF No. 34 at 13; ECF No. 38 at 12. Mr. Queen then returned to the corral area with Mr. Viles.

Plaintiffs are somewhat unclear about the timing[5], but at some point during the morning Dr. Cumani mentioned that he planned to return to North Dakota, where he is from, and Mr. Queen replied, "No you're not. You're going to Richmond's house. You're not going to leave Richmond's house." ECF No. 38 at 10; *Id.* at 15. Defendant denies this, and states that he merely asked Plaintiffs to remain in the area. ECF No. 34 at 12 n.3. In any case, Plaintiffs complied. ECF No. 38 at 10. Mr. Queen did not remove his handgun from his holster or handcuff anyone, nor did he seize Plaintiffs' guns. ECF No. 34 at 12; ECF No. 38 at 10.

Mr. Queen subsequently left with Mr. Peters, allegedly to find the wounded elk. ECF No. 34 at 13; ECF No. 38 at 15. Mr. Queen and Mr. Peters found a cow elk, which Mr. Queen alleges was wounded because she did not move when they approached her. ECF No. 34 at 13; ECF No. 38 at 15. Mr. Queen, who had the authority as a Warden to shoot wounded animals, shot and killed the elk. ECF No. 34 at 14; ECF No. 38 at 15. Per his trial testimony, Mr. Queen observed fresh wounds in the animal's front leg, which he believed to be consistent with a bullet exploding and fragmenting. ECF No. 34 at 14. Plaintiffs dispute this conclusion. ECF No. 38 at 16.

---

[5] In their initial analysis section Plaintiffs state that this happened by 10:30 a.m., before Mr. Queen went to inspect the shooting location with Mr. Viles. ECF No. 38 at 23. However, in the section where they dispute Defendant's facts, they counter that this actually occurred after the investigation with Mr. Viles. ECF No. 38 at 15. Regardless, Mr. Queen was investigating possible wrongdoing the entire time, and so the discrepancy does not affect the overall conclusion.

Mr. Queen states that he continued to search for a second animal, and at around 1:00 p.m. he found and killed a wounded bull elk. ECF No. 34 at 14. However, Mr. Richmond alleges that he and Mr. Viles watched Mr. Queen through a spotting scope and saw that the bull elk Mr. Queen shot had not originally been wounded. *Id.* at 15; ECF No. 38 at 16; ECF No. 38 at 9. Mr. Queen looked for bullets but could not find any. ECF No. 34 at 15; ECF No. 38 at 16. He then field dressed the elk, and at around 4:30 he and Mr. Peters loaded the two elk into Mr. Queen's truck. ECF No. 34 at 15; ECF No. 38 at 16. At no point after meeting with Plaintiffs did Mr. Queen hear any additional gunshots. ECF No. 34 at 15; ECF No. 38 at 16.

In the early evening, Mr. Queen returned to Mr. Richmond's house. ECF No. 38 at 10. Mr. Richmond alleges that Mr. Queen was very angry and told him he needed to get a lawyer. *Id.* The elk were in the back of Mr. Queen's truck. *Id.* Mr. Richmond alleges that the wounds on one of the elk looked like the type of wire cut that comes from fences, and that he was not allowed to look at the second elk. *Id.* at 11. Around 7:30 p.m., Mr. Queen told Dr. Cumani and Mr. Shehu that "everything was okay," and he was sorry to have held them up. *Id.*

The next day, the morning of October 28, 2019, Mr. Queen went to the Heart Mountain area to investigate. ECF No. 34 at 16; ECF No. 38 at 11. According to the Probable Cause Affidavit, over the course of his investigation Mr. Queen found two additional elk carcasses near the wounded elk he had dispatched the day before, and in one of the carcasses he found a bullet. ECF 35-18 at 9; ECF 34 at 18. Mr. Queen then returned to the Plaintiffs' shooting location and collected bullet casings. ECF No. 34 at 19; ECF No.

38 at 19. Mr. Queen measured the bullet he had found in the deer and found that it was very similar in size to the bullet used in the guns of Dr. Cumani and Mr. Shehu. *Id.* at 20. Mr. Queen also determined that the second set of elk were visible from the Plaintiffs' shooting location through a shooting scope. *Id.* Mr. Queen noted in his Affidavit that he contacted every individual that he was aware of who hunted in the Heart Mountain area on October 27th, and the only individuals who reported having shot at elk were Dr. Cumani, Mr. Shehu, and Mr. Schnell. *Id.* at 21.

Plaintiffs largely do not dispute what Mr. Queen did during his October 28th investigation, other than his discussions with external parties and the descriptions of his state of mind, both of which have not been included here. ECF No. 38 at 19-20. They add that Mr. Queen sent the bullet fragments to the State of Wyoming Division of Criminal Investigation, where a ballistics expert concluded that there was not enough evidence to confirm that the bullet fragment came from one of the guns used by Dr. Cumani and Mr. Shehu. ECF No. 38 at 11. Mr. Queen has never identified who he thought shot the wasted elk, whether it was Dr. Cumani or Mr. Shehu. *Id.* at 12.

Both parties agree that on January 16, 2020, Mr. Queen executed an Affidavit of Probable Cause which was the basis for the criminal charges against Dr. Cumani and Mr. Shehu. ECF No. 64 at 3. The next day, Misdemeanor Informations were filed in *State v. Cumani*, Criminal Docket No. 2020-34-00 and *State v. Shehu*, Criminal Docket No. 2020-35-00, both in the Circuit Court of the Fifth Judicial District for Park County. *Id.* On February 28, 2020, Mr. Shehu pled Not Guilty for violating W.S. § 23-3-303(a). *Id.* On

March 6th Dr. Cumani also pled Not Guilty to the same crime. *Id.* at 21. Both Dr. Cumani and Mr. Shehu were acquitted of the crime on September 4, 2020, after their trial. *Id.*

## PROCEDURAL BACKGROUND

Defendant filed his *Motion for Summary Judgement* and accompanying *Memorandum in Support* on March 11, 2024. ECF No. 33; ECF No. 34. Plaintiffs responded with their *Response in Opposition to Defendants' Motion for Summary Judgment* on April 1, 2024. ECF No. 38. Defendant filed a *Reply Memorandum in Support* of his original motion on April 8, 2024. ECF No. 41. Plaintiffs filed a *Supplemental Authority in Opposition to Defendant's Motion for Summary Judgment* on September 24, 2024, and Defendant's *Response* was filed the same day. ECF No. 75; ECF No. 77.[6]

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if, under the substantive law, it is essential to the proper disposition of the claim. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[6] The issues brought up in Plaintiffs' final motion on this matter involve state common law and do not affect our analysis of the Fourth or Fourteenth Amendments. ECF No. 75 at 1. Therefore they will not be discussed here.

8

The party moving for summary judgment has the burden of establishing the nonexistence of a genuine dispute of material fact. *See Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013). The moving party can satisfy this burden by either: (1) offering affirmative evidence that negates an essential element of the non-moving party's claim; or (2) demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B). A movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies this initial burden, the non-moving party must support its contention that a genuine dispute of material fact exists by either: (1) citing to materials in the record; or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B). To survive a summary judgment motion, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Credibility determinations are the province of the factfinder, not the Court. *Anderson*, 477 U.S. at 255; *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000).

**PARTIES' ARGUMENTS**

9

Defendant first argues that qualified immunity bars Plaintiffs' false arrest claim. ECF No. 34 at 24. Qualified immunity protects government officials unless they both 1) violated a federal statutory or constitutional right and 2) that unlawfulness of their conduct was "clearly established." *Id.* at 23.

Defendant contends that he has qualified immunity because Plaintiffs cannot prove that both a) his actions did, in fact, constitute an arrest, and b) those actions were "clearly established" as constituting an arrest. ECF No. 34 at 24. Defendant argues that even if he had ordered Plaintiffs to stay at Mr. Richmond's house, those actions constitute a detention, not an arrest, because he did not use any force and had Plaintiffs stay there only for the time it took him to investigate a potential crime. ECF No. 34 at 25. He argues that there is no clearly established law that such actions are considered an arrest. *Id.* at 26.

Defendant next contends that he did not violate the Fourth Amendment because even if his actions did constitute an arrest, he had sufficient probable cause to do so and the relevant clearly established law gives law enforcement officers wide latitude on the matter. *Id.* at 26-28. Finally, he argues that, at minimum, he had reasonable suspicion that Plaintiffs had committed a crime, and reasonable suspicion justifies an investigatory detention. *Id.* at 28-29.

Second, Defendant argues that qualified immunity also bars Plaintiffs' malicious prosecution claim. ECF No. 34 at 29-31; ECF No. 41 at 6. Mr. Queen states that a valid Fourth Amendment malicious prosecution claim must assert that a seizure – in this case a detention or alleged arrest – must occur *after* the institution of legal process. ECF No. 34 at 30. In this case, Plaintiffs' alleged detention or arrest occurred well before any

institution of legal process, which happened three months later when Misdemeanor

Informations were filed against them. ECF No. 41 at 7. Plaintiffs allege no other seizures.

*Id.* at 7. Defendant also points out that even if Plaintiffs were alleging a malicious

prosecution claim under the Fourteenth Amendment, such a claim would be precluded by

Wyoming's state remedy for the same claim. *Id.* at 9-10.

Plaintiffs counter that freedom from wrongful detention and malicious prosecution

are clearly established laws, and that Defendant's actions are unconstitutional because he

did not possess reasonable suspicion, let alone probable cause, that Plaintiffs committed

any crime. ECF No. 38 at 21-23. They claim that Mr. Queen had no knowledge of any

crime when he arrested Defendants, and therefore could not have had reasonable

suspicion of anything other than the wrong-sex shooting of the bull elk to which Mr.

Schnell had already admitted. *Id.* at 23. They also argue that once Mr. Queen had written

down the make and model of Plaintiff's guns and their contact information he had no

further reason to detain them. *Id.* at 24.

Regarding the malicious prosecution, Plaintiffs argue primarily that there was no

probable cause to support the prosecution, or at least that there are sufficient disputable

facts such that the issue must survive summary judgment. *Id.* at 25. Finally, Defendants

argue that the institution of legal process does not need to precede detention for a

malicious prosecution claim under the Fourth Amendment to be valid. *Id* at 28.

## ANALYSIS

This Court finds that Dr. Cumani and Mr. Shehu's malicious prosecution claim fails

as a matter of law and that the elements of their false arrest claim are not clearly established

enough to withstand qualified immunity. We therefore grant summary judgment in favor of Mr. Queen.

### A. Malicious Prosecution

A malicious prosecution claim can be realized under § 1983 and either the Fourth Amendment or the Fourteenth Amendment. *See Myers v. Koopman*, 738 F.3d 1190, 1192 (10th Cir. 2013). The Tenth Circuit has determined that claims under the Fourteenth Amendment, which prevents deprivations of liberty without due process of law, must be dismissed if "an adequate post-deprivation remedy – such as a state tort claim – will satisfy due process requirements." *Id.* Wyoming has such a remedy, and therefore Plaintiffs cannot assert a Fourteenth Amendment malicious prosecution claim, which they do not specifically allege in any case. *Seamster v. Rumph*, 698 P.2d 103, 104 (Wyo. 1985).

Under the Fourth Amendment, malicious prosecution has four elements: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Pollack v. Miller*, 859 F. App'x 856, 860 (10th Cir. 2021). However, ("[b]ecause this claim is housed within the Fourth Amendment," plaintiff must also "prove that he was seized as a result of the malicious prosecution." *Thompson v. Clark*, 596 U.S. 36, 43 (2022). *Pollack* further clarifies that "unlike a false arrest claim, malicious prosecution concerns detention only *after* the institution of legal process." 859 F. App'x at 860. (citations omitted) (emphasis added); *Accord Myers,* 738 F.3d at 1194 ("where detention occurs after the institution of legal process, a plaintiff can claim that the legal

process itself was wrongful, and thereby state a Fourth Amendment violation sufficient to support a § 1983 malicious prosecution cause of action").

This Court finds that Dr. Cumani and Mr. Shehu's claim for malicious prosecution under the Fourth Amendment must also be dismissed as a matter of law. Plaintiffs must show that they were detained after the institution of legal process. *Pollak*, 859 F. App'x at 860. They allege that they were detained on October 27th, whereas the institution of legal process, in the form of the filing of Misdemeanor Informations, did not occur until January 17, 2020 – almost three months later. ECF No. 2 at 2-3; ECF No. 64 at 3. Plaintiffs' assertion that the timeline of events does not matter is incorrect. We therefore grant summary judgment as a matter of law on Dr. Cumani and Mr. Shehu's malicious prosecution claim.

### B. False Arrest

We next turn to the false arrest claim. A plaintiff can recover for wrongful arrest under § 1983 and the Fourth Amendment if they show they were arrested without probable cause. *Cottrell v. Kaysville City, Utah*, 994 F.2d 730, 733 (10th Cir. 1993). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338. Officers need "only the kind of fair probability on which reasonable and prudent people... act." *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1220 (10th Cir. 2020) (citations omitted). "[W]e judge probable cause to arrest by what facts the officer knew at arrest." *Id.* at 1221.

Additionally, because both parties agree that Mr. Queen was a law enforcement officer at the time of the alleged incident, this court must consider whether he is protected by qualified immunity. ECF No. 34 at 4; ECF No. 38 at 13. "Government officials sued

under 42 U.S.C. § 1983 are entitled to qualified immunity unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Roberts v. Winder*, 16 F.4th 1367, 1374 (10th Cir. 2021) (citing *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589 (2018); *accord Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022). When a defendant asserts qualified immunity at the summary judgment stage, it is the Plaintiffs' burden to prove both prongs of qualified immunity. *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021).

"For the law to be clearly established, there ordinarily must be a Supreme Court of Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction." *Pompeo v. Bd. of Regents of the Univ. of New Mexico*, 852 F.3d 973, 981 (10th Cir. 2017). Additionally, "the dispositive question is 'whether the violative nature of particular conduct is clearly established. This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine… will apply to the factual situation the officer confronts." *Id.* (citations omitted).

Taking Plaintiffs' facts as true, at least some form of non-consensual detention took place; determining the severity of the Fourth-Amendment seizure is therefore critical to the constitutional analysis. "The Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." *Oliver v. Woods*, 209

F.3d 1179, 1186 (10th Cir.2000). An investigative detention is "'a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause.' An officer 'can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Oliver*, 209 F.3d at 1186). If a police-citizen encounter exceeds the limits of an investigative detention, also called a *Terry* stop, it then becomes an arrest that must be supported by probable cause. *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008).

### 1. The detention was justified at its inception.

There is a two-step process for determining whether an investigative detention was reasonable under the Fourth Amendment or whether it morphed into an arrest. *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010). First, we assess whether the investigative detention was "justified at its inception." *Id.* "For an investigative detention to be valid, an officer must have had 'objectively reasonable articulable suspicion' that a detainee committed or is about to commit a crime" based on "the totality of the circumstances." *Id.* (quoting *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir.2003)); *accord Soza v. Demsich*, 13 F.4th 1094, 1101 (10th Cir. 2021).

Mr. Queen had objectively reasonable suspicion that someone in the hunting group had illegally injured elk. First, Mr. Queen knew that the hunting party had been shooting elk, and he presents admissible evidence that he received information, if not necessarily accurate information, that additional elk may have been wounded that would have violated

regulations. ECF No. 34 at 27; ECF 35-26 at 4; ECF No. 38 at 24. Both Mr. Richmond and Mr. Viles reported to Mr. Queen that one of their hunters had committed a crime – he had shot a bull elk on a cow license. ECF No. 38 at 23. Mr. Queen therefore knew that the group was actively hunting and had sufficient reasonable suspicion to detain at least Mr. Viles and Mr. Schnell, who had shot the bull.

Second, Mr. Queen presents admissible evidence, in the form of Mr. Peters' testimony from Plaintiffs' underlying criminal trial[7] and his own affidavit summarizing his motivation for investigating the hunting group,[8] that Mr. Peters and Mr. Worstell had told him about wounded elk. ECF No. 35-26 at 4; ECF No. 35-1 at 5. Mr. Peters' and Mr. Worstell's statements collectively give rise to "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Cortez*, 478 F.3d at 1115.[9] In their *Opposition* motion, Plaintiffs affirm that these calls occurred, and that Mr. Queen based his investigation on the information he received from Mr. Peters and Mr. Worstell. ECF No. 2 at 3. Nothing exists in the record to suggest those conversations did not happen.

Plaintiffs' primary dispute is that no prudent officer would have trusted or relied on the statements of Mr. Peters or Mr. Worstell. Plaintiffs allege that neither individual could have seen the hunting party as they were between one and two miles away from the wounded elk when they called Mr. Queen. ECF No. 38 at 7. But Plaintiffs have no evidence of the callers' locations other than Mr. Queen's own approximation of where they were,

---

[7] This would be admissible evidence if Mr. Peters himself wasn't available. *See* Fed. R. Evid. 804.

[8] This would be admissible evidence as a hearsay exception under Fed. R. Evid. 803 (3).

[9] Additionally, Plaintiffs' own witness, Mr. Richmond, claims that Mr. Queen knew of wounded elk even before Mr. Richmond mentioned Mr. Schnell's accidental shooting of the bull on the phone. ECF No. 38 at 6-7. This suggests that Mr. Queen had heard from someone that elk had been wounded.

which he assessed based on where they would have needed to be to see the elk and/or the hunters. ECF No. 38-8 at 13, 30. This does not substantiate Plaintiffs' claim that Mr. Queen should not have believed the callers' information; if anything, it shows Mr. Queen's poor assessment of distances in general. Plaintiffs also state that neither Mr. Peters nor Mr. Worstell were "trustworthy" because "Queen knew that Mr. Peters did not get along with Mr. Richmond" and "Mr. Worstell has considered Defendant Queen to be a friend." ECF 38 at 25; *Id.* at 8. However, Plaintiffs cite no caselaw to suggest that a law enforcement officer must assume that an informant is lying just because the informant "does not get along with" the person who might be impacted by the information. ECF No. 38 at 7. A prudent officer that is aware of a potential bias might perform additional investigative work before acting on that information. Indeed, the probable cause standard – which is more exacting than reasonable suspicion – "requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed… before invoking the power of warrantless arrest and detention." *Lundstrom*, 616 F.3d at 1125–26 (citing *Cortez*, 478 F.3d at 1117). But that is precisely what Mr. Queen did by calling a second person (Mr. Worstell) and interviewing other hunters in the area to find out if anyone else had shot their gun that day. ECF No. 38 at 11-12. The additional fact that Mr. Worstell and Mr. Queen were friendly also does not require Mr. Queen to disregard Mr. Worstell's information.

In sum, the "totality of the circumstances" that Mr. Queen considered on the morning of October 27, 2019, included: two potentially biased reports of wounded elk and gunshots in the general area, if not the immediate vicinity, of the Plaintiffs' hunting group,

the knowledge that Plaintiffs' hunting group had been shooting a group of elk and had illegally killed one of them, and some preliminary interviews showing that no other hunters in the area had shot their guns that day. Taken together, that is sufficient to form "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Cortez*, 478 F.3d at 1115.

### 2. Mr. Queen's actions were reasonably related to the investigation.

The second step that we consider is "whether the officer's actions were reasonably related in scope to the circumstances that first justified the interference." *Lundstrom*, 616 F.3d at 1120. "While there is no litmus-paper test for determining when an investigative detention enters the realm of an arrest, we have stated an arrest is distinguished from an investigative detention "by the involuntary, highly intrusive nature of the encounter." *Id.* (quoting *Cortez*, 478 F.3d at 1115). The Court must "conduct a fact-intensive inquiry to distinguish between arrests and Terry stops. Our inquiry considers both the officers' forceful measures and the detention's length." *Hemry v. Ross*, 62 F.4th 1248, 1254 (10th Cir. 2023). This Court uses these two variables – force and length of detention – to determine whether Mr. Queen's actions pushed through the boundary of an investigation detention to become an arrest.

Mr. Queen did not use any physical force in his interactions with anyone in the Plaintiffs' hunting party. "The use of firearms, handcuffs, and other forceful techniques, for example, generally indicate an investigative detention has evolved into an arrest." *Lundstrom*, 616 F.3d at 1120 (quoting *Cortez*, 478 F.3d at 1115). Even fairly minimal force can elevate an elevate a detention to an arrest – pulling a person out of their house and

handcuffing them, for instance. *Cortez*, 478 F.3d at 1116. Here, however, it is undisputed that Mr. Queen did not draw a weapon, use handcuffs, or seize either hunter's gun. ECF No. 38 at 15. According to Plaintiffs, he merely ordered them to go to Mr. Richmond's house and not to leave. *Id.* at 10. The lack of force used here would otherwise indicate that this was an investigatory detention, if not for the length of time that Dr. Cumani and Mr. Shehu were detained: somewhere in the realm of seven to nine hours. *See* ECF No. 38 at 24.

Evaluating Mr. Queen's actions along this second axis is more challenging because of the relative paucity of cases examining detention length. We have but one clear requirement: "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the [law enforcement officer] diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *accord United States v. White*, 584 F.3d 935, 953 (10th Cir. 2009) ("an investigative detention must… last no longer than is necessary to effectuate the purpose of either dispelling or confirming the officer's reasonable suspicion"). No particular length of time is objectively unconstitutional: the Supreme Court has held that a sixteen-hour detention was reasonable within the context of immigration because of the potential national security risks involved. *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 542-44 (1985). However, the Tenth Circuit has also held that a four-hour detention violates the Fourth Amendment if the officer receives information

midway through that detention that eliminates his or her reasonable suspicion. *Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 958 (10th Cir. 2018).

While Dr. Cumani and Mr. Shehu's nine-hour detention probably would not be justifiable in other circumstances, we hold that, within the context of investigating a back-country hunting violation, it was not unconstitutional: Mr. Queen was diligently investigating the potential crime during that entire period; the detention was necessary because he would have needed to seize the Plaintiffs' weapons as evidence if he had found any bullets; and once his suspicion was dispelled, he told Plaintiffs they could leave. *See* ECF No. 34 at 12; ECF No. 38 at 15. Between roughly noon, when Plaintiffs allege Mr. Queen ordered them to stay in the house, and 7 p.m., when he released them, Mr. Queen drove to look for wounded elk, found two of them, shot them, examined them, field-dressed them, and drove back to Mr. Richmond's house. ECF No. 34 at 13-14. Such activities take time and were "reasonably related in scope to the circumstances that first justified the interference." *Sandberg*, 727 F. App'x at 957 (quoting *United States v. Cervine*, 347 F.3d 865, 868 (10th Cir. 2003)).

> 3. Even if Mr. Queen's actions were not reasonably related to the circumstances, qualified immunity would protect Mr. Queen because Plaintiffs have not alleged that the law is clearly established on detentions.

Other than their arguments about reasonable suspicion, plaintiffs make two points that challenge whether Mr. Queen's actions were not "reasonably related in scope to the circumstances." *Lundstrom*, 616 F.3d at 1120. The first is a minor possible dispute about

what Mr. Queen did during his investigation: Mr. Richmond states in his deposition that

he saw, through a hunting scope, that the bull elk Mr. Queen shot was not originally injured.

ECF No. 38 at 16. Plaintiffs do not allege this in their version of the facts, nor do they use

that portion of Mr. Richmond's testimony in their analysis. It is therefore unclear whether

there really is a dispute between Plaintiffs and Mr. Queen about whether the latter did, in

fact, kill an uninjured elk. In any case, Plaintiffs provide no evidence to support why Mr.

Richmond thought the elk was uninjured, why Mr. Queen would kill an uninjured elk, or

how he would have tracked and killed a bull elk in the span of half an hour if it were not

injured. *See* ECF No. 34 at 14-15. However, even if Mr. Queen did kill an uninjured elk

during his investigation, thereby making the Plaintiffs' detention unreasonable, he would

still be protected by qualified immunity because the law is not clearly established regarding

extended detentions. The Tenth Circuit has held that for a plaintiff to overcome qualified

immunity in the case of an unconstitutionally extended detention, it is not sufficient to cite

cases that focus on probable cause to make an arrest. *Sandberg*, 727 F. App'x at 959. The

cases that Mr. Shehu and Dr. Cumani cite focus exclusively with probable cause. *See*

*Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996); *Cottrell v. Kaysville City, Utah*, 994

F.2d 730, 734 (10th Cir. 1993); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir.

2002).

The second point Plaintiffs make is that, even if Mr. Queen did have reasonable

suspicion, he did not need to detain them – he had all of their contact information and could

have contacted them after his investigation. ECF No. 38 at 24. However, the same rule

applies: even if Mr. Queen should have seized the hunters' guns immediately and released

them, Plaintiffs again do not cite any particular case establishing that temporarily detaining suspect individuals during an investigation to preserve evidence is unconstitutional. *See* ECF No. 34 at 25. Because no case law has been identified that would have alerted Mr. Queen that he was violating the Fourth Amendment, he did not violate clearly established law and is entitled to qualified immunity. *See Sandberg*, 727 F. App'x at 960.

> ### 4. If this were an arrest, qualified immunity would still protect Mr. Queen from liability.

This Court notes, however, that even if this was considered an arrest, qualified immunity would still prevent this case from moving forward past summary judgment. Law enforcement officers need "only the kind of fair probability on which reasonable and prudent people… act." *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1220 (10th Cir. 2020). Qualified immunity only requires that "a reasonable officer could have believed that there was probable cause." *Pollack*, 859 F. App'x at 860.

Mr. Queen had probable cause to arrest Mr. Schnell for violating the law because he admitted to doing so. For the reasons mentioned above, Mr. Queen had reason to believe that other crimes had occurred, namely the killing of additional elk for which Plaintiffs did not have a license. He had also done some preliminary investigation of other hunters in the area, none of whom had shot their weapons. Based on the "circumstances as they would have appeared to prudent, cautious and trained… officers," *United States v. Davis,* 197 F.3d 1048, 1051 (10th Cir. 1999), a reasonable officer could find that there was "a fair probability" that some member of the hunting group had committed an additional crime. *Hinkle*, 962 F.3d at 1220.

Plaintiffs make much of the fact that "Defendant Queen never determined or specified, much less proved, which of Dr. Cumani or Mr. Shehu shot or wounded… the elk." ECF No. 38 at 2. But despite having the burden to do so, Plaintiffs cite no authority to establish at any level of particularity that such specific evidence is required. *See Soza,* 13 F.4th at 1099 (holding that plaintiffs have the burden, when qualified immunity is asserted at summary judgment, of showing that the law is clearly established); *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established, which means courts may not 'define clearly established law at a high level of generality." (citations omitted)).

Indeed, the law is *not* clearly established on that matter. A Tenth Circuit case has held that it is not clearly established whether "an officer could not arrest an entire small group when he knows some unidentifiable members, if not all members, of that group have committed a crime." *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1028 (10th Cir. 2015). The court in that case also did not determine that such an arrest *would be* constitutional – it only addressed the question of whether the law on that point was clearly established. *Id.* Thus, the law's murkiness remains outstanding. Because Mr. Queen could reasonably have had probable cause to think that at least of the members of the hunting group had committed a crime, and because the law was not clearly established whether arresting all of three of them was a violation of the Fourth Amendment, this Court finds that Mr. Queen cannot be held responsible as a matter of law.

## CONCLUSION

This Court finds that there is no genuine issue of material fact about whether Mr. Queen falsely arrested or maliciously prosecuted Mr. Shehu and Dr. Cumani. Based on the foregoing, **IT IS HEREBY ORDERED** that Defendants' *Motion for Summary Judgment* (ECF No. 33) is **GRANTED.**

Dated this 2ᵈ day of October, 2024.

Alan B. Johnson
United States District Judge